**TENNESSEE PUBLIC SERVICE
COMMISSION et al.,
Appellants-Defendants,**

v.

**NASHVILLE GAS COMPANY,
Appellee-Plaintiff.**

Supreme Court of Tennessee.

March 21, 1977.

Eugene W. Ward, Gen. Counsel, T.P.S.C., T. E. Midyett, Jr., Asst. Gen. Counsel, T.P.S.C., Larry D. Woods, Jinx S. Thomas, Nashville, for appellants-defendants.

John W. Kelley, Jr., Leslie B. Enoch, II, Nashville, William W. Bedwell, Washington, D.C., for appellee-plaintiff.

## OPINION

HARBISON, Justice.

Appellee, Nashville Gas Company, is a gas distributing company, serving Metropolitan Nashville and portions of several adjacent counties in Middle Tennessee. It

is a Tennessee corporation, engaged solely in intrastate commerce, and is a public utility subject to the jurisdiction of and regulation by the Tennessee Public Service Commission.

All of the stock of appellee is owned by another Tennessee corporation, Tennessee Natural Gas Lines, Inc., which is publicly held. This corporation is a "natural gas company" within the meaning of the federal Natural Gas Act of 1938,[1] but it is such only because it sells natural gas to its wholly-owned subsidiary, Nashville Gas Company, for resale. Otherwise, it is a domestic corporation operating wholly within the boundaries of the state. Other than its subsidiary, it has three other customers to which it makes direct sales of natural gas, all of these being large industries situated in Davidson County and being within the area authorized to be served by the subsidiary, Nashville Gas Company, under its certificate of convenience and necessity.[2]

Tennessee Natural Gas Lines, Inc., does not have a certificate from the state Commission. Since it is a "natural gas company" within the meaning of the federal statute, its operations are regulated by the Federal Power Commission, to the extent of the jurisdiction of that Commission. It is undisputed, however, that the Federal Power Commission does not fix the prices which Tennessee Natural Gas Lines, Inc., charges to its direct industrial customers in the Nashville area, nor does it have jurisdiction to do so under present statutory provisions.

On January 16, 1975, appellee, Nashville Gas Company, made application to the Tennessee Public Service Commission for an emergency rate increase, seeking additional revenues in order to enable it to meet the requirements of a maturing bond issue. Temporary rate increases were authorized and put into effect, under bond, on March 13, 1975. On April 14, 1975 appellee filed with the Commission an application for a general permanent rate increase, and the two matters were consolidated for hearing and disposition.

Extensive hearings were held and a voluminous record compiled before the Commission in September and October 1975. On October 14, the Commission entered an order finding that Nashville Gas Company was entitled to a rate structure which would yield 13.5% return on common equity and 12.14% return on its rate base. In order to accomplish this return, the Commission found that appellee required additional annual gross revenues of $3,056,-132.00. The emergency rate increases under bond were found to produce $1,909,-088.00 of this amount, and these increases were made permanent. The Commission found that an additional $1,147,044.00 in gross revenues, over the bonded revenues, were required. It authorized tariffs to produce this additional revenue subject, however, to an offset or reduction by the revenues received by the parent corporation, Tennessee Natural Gas Lines, Inc., from its direct industrial sales within the Nashville area. The Commission found that the appellee had declined to furnish it with the necessary data to compute accurately the amount of this offset or reduction, referred to in the record as an "imputation adjustment". It directed appellee immediately to file with the Commission additional data which the Commission felt necessary in order for it to determine the effect of the operations of the parent upon the authorized rate structure of the subsidiary. One member of the Commission dissented as to this portion of the order, stating that he regarded the operations of the parent corporation as entirely separate and distinct from those of the subsidiary; therefore, he considered irrelevant and illegal the additional information ordered by the majority.

---

1. 15 U.S.C.A. § 717 et seq.

2. The subsidiary was apparently not franchised by the City of Nashville to sell outside the city limits, and it did not receive a franchise from local government to serve all of Davidson County until the advent of Metropolitan Government in 1963. Nevertheless it was certificated by the Commission to serve Nashville and its environs in the 1930s or before, and it made sales outside the Nashville city limits under that certificate long before 1963. Its franchised territory under local government and its certificated area by the Commission are not and have never been identical.

Continuing its refusal to furnish the requested data, appellee filed a petition for certiorari to the Chancery Court pursuant to T.C.A. § 65–220,* and also filed an original complaint in that court, alleging that the rate structure authorized by the Commission was confiscatory.

Both before the Commission and in the Chancery Court there were numerous contested issues, involving many factors and considerations which go into the complex process of utility rate making. The Chancellor resolved most of the disputed issues in favor of the Commission and generally approved its October 14, 1975 order, with two exceptions. The two issues which he resolved in favor of appellee form the basis of the present appeal to this Court by the Commission.

The Chancellor held that the Commission was in error in taking into consideration the operations and revenues of the parent corporation, Tennessee Natural Gas Lines, Inc., and in directing the filing of additional data concerning its industrial sales in Davidson County, holding that these were an improper and irrelevant consideration in fixing reasonable rates for the subsidiary. He also resolved in favor of appellee a disputed issue concerning the reasonableness of expenses and fees incurred in the present rate proceedings. We will consider these two issues separately.[3]

### I. The Parent-Subsidiary Issue

■ It is clear from the record in this case that the prices which the parent corporation, Tennessee Natural Gas Lines, Inc., charges its subsidiary for natural gas are regulated by the Federal Power Commission. Also regulated by that Commission are the volumes and priorities of natural gas sold by the parent to its three large industrial customers in the Nashville area. The prices at which such gas is sold to these

industries is not, however, regulated by the Federal Power Commission nor, under the settled interpretation of the Natural Gas Act, are those prices subject to regulation by that Commission. See Federal Power Commission v. Transcontinental Gas Pipe Line Corp., 365 U.S. 1, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961); Cities Service Gas Co. v. U. S., 500 F.2d 448, 205 Ct.Cl. 16 (1974).

■ It is also well settled that the Natural Gas Act was not designed to remove from the states substantial regulation of the natural gas industry, but rather it was designed to provide federal regulation in certain areas which were not subject to state jurisdiction under the interstate commerce clause of the United States Constitution. Dual regulation is clearly contemplated both by the terms of the federal statute and by the cases interpreting it. Memphis Natural Gas Co. v. McCanless, 183 Tenn. 635, 194 S.W.2d 476 (1946), appeal dismissed, 329 U.S. 670, 67 S.Ct. 99, 91 L.Ed. 591 (1946).

In the case of Panhandle Eastern Pipe Line Co. v. Public Service Commission of Indiana, 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128 (1947), the United States Supreme Court expressly held that direct sales to industrial customers by an interstate pipe line carrier are subject to regulation by state utility commissions, even though such sales are a part of interstate commerce. See also Panhandle Eastern Pipe Line Co. v. Michigan Public Service Commission, 341 U.S. 329, 71 S.Ct. 777, 95 L.Ed. 993 (1951), where an interstate pipe line was required to obtain a certificate of convenience and necessity from a state commission before making direct industrial sales to natural gas customers. There the Court said:

". . . the sale and distribution of gas to local customers made by one engaged in interstate commerce is 'essen-

---

* Neither party has cited the Uniform Administrative Procedures Act, T.C.A. §§ 4–507 et seq. However, its application would not affect the issues presented to us.

3. In support of its assignments of error, appellant Commission has attached as "Exhibits" to its brief a number of documents not introduced

in evidence in the Commission hearings or before the Chancellor. This is improper practice, and we sustain appellee's Motion to Strike these documents and the references thereto in appellant's brief. No consideration has been given to them by the Court.

tially local' in aspect and is subject to state regulation without infringement of the Commerce Clause of the Federal Constitution, article 1, § 8, cl. 3. In the absence of federal regulation, state regulation is required in the public interest." 341 U.S. at 333, 71 S.Ct. at 779.

 Since, in the present case, the parent corporation, Tennessee Natural Gas Lines, Inc., is regulated by the Federal Power Commission as to volumes and priorities, it would not be appropriate for the local Commission to undertake such regulation. Inasmuch as the prices charged by the parent corporation to its customers are not regulated, however, we think that it is beyond question that the Tennessee Public Service Commission has jurisdiction and authority to regulate those prices directly, if it should see fit to do so.

We have previously pointed out that the parent corporation is in "interstate commerce" solely and exclusively because of the language of the federal Natural Gas Act, 15 U.S.C.A. § 717 et seq. which places under the Federal Power Commission sales in interstate commerce for resale. Were it not for the sales made by the parent directly to its subsidiary for resale, the entire system of the parent and the subsidiary would be wholly intrastate, and would be subject to regulation in its entirety by the Tennessee Public Service Commission. The parent corporation does not operate across state lines, but its pipeline taps onto an interstate pipeline in Cheatham County, Tennessee, and brings natural gas into Davidson County, where it is sold to the subsidiary and to the three industrial customers.

Tennessee Natural Gas Lines, Inc. has no operating employees. Nashville Gas Company has some three hundred and forty-two operating employees. These perform various tasks for the parent as well as the subsidiary, and the parent reimburses the subsidiary for their services. The two corporations have common officers and directors, some of the officers being wholly paid by the subsidiary and some of them being paid by the parent. The parent acquired all of the stock of the subsidiary in

1945, and has held it continuously since that time.

The dissenting member of the Public Service Commission felt that it was improper for the Commission to consider any of the operations and sales of the parent, because of the separate corporate structure and because the parent is engaged in interstate commerce, subject to federal regulation. He also felt that it was improper to "pierce the corporate veil" because there was no evidence of fraud, misconduct or impropriety in the management and operation of the two companies.

We are in agreement with the latter statement of the Commissioner, and because of certain statements and comments made in the briefs and in the record we feel constrained to state that we find no evidence whatever of any misconduct, illegality or impropriety in any of the management decisions and transactions which are reflected in this record. The decisions by the management of the two companies to have the direct sales made to industrial customers by the parent, rather than the subsidiary, were based upon legitimate financial and corporate concerns at the time, probably including the fact that the sales were not subject to federal regulation and had not in fact been regulated locally. There were many other considerations which entered into the decisions, however, all of which were justified from a management and financial standpoint.

 Having said this, we are, on the other hand, equally convinced that a regulatory body, such as the Public Service Commission, is not bound in all instances to observe corporate charters and the form of corporate structure or stock ownership in regulating a public utility, and in fixing fair and reasonable rates for its operations. The filing of consolidated reports by parent and subsidiary corporations, both for tax purposes and regulatory purposes, is so commonplace as to be completely familiar in modern law and practice. Considerations of "piercing the veil", which are involved in cases involving tort, misconduct or fraud, are largely irrelevant in the regulatory and

revenue fields. In order for taxing authorities to obtain accurate information as to revenues and expenses, the filing of consolidated tax returns by affiliated corporations is frequently required, and rate-making and regulatory bodies frequently can and do consider entire operating systems of utility companies in determining, from the standpoint both of the regulated carrier and the consuming public fair and reasonable rates of return.

In some of the federal cases most relied upon by appellee in its brief, the courts have considered parent and subsidiary corporations as a group or as an operating system, and have considered for rate-making purposes many aspects of inter-company relationships, including sales between affiliated companies, expenses charged and the like. Thus, in the case of *Smith v. Illinois Bell Telephone Co.*, 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255 (1930), relied upon by appellee for the proposition that intrastate and interstate revenues, property and expenses must be allocated in fixing utility rates, the Supreme Court of the United States set aside and reversed a district court order which had found confiscatory certain rates set by an Illinois regulatory commission. The Court remanded the case for further proof and specific findings as to the reasonableness of charges made to the regulated intrastate company by its interstate parent and an interstate affiliate, the parent owning 99% of the stock of both the regulated company and the affiliated corporation, Western Electric Company.

In that case, the Court expressly held that the relationship between the subsidiary, its parent and its sister corporation demanded "close scrutiny" even though it recognized that separate corporate structures and operations should be observed. In that case the Court referred to Western Electric Company as "virtually the manufacturing department" of the entire system, and its net profits were specifically required to be taken into consideration in connection with the rates of the intrastate company, Illinois Bell Telephone Company, then under consideration.

Similarly, in *Colorado Interstate Gas Co. v. Federal Power Commission*, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206 (1945), the Federal Power Commission treated two separate companies, subsidiaries of larger oil companies, as having been "operated as a single enterprise." 324 U.S. at 588, 65 S.Ct. 829. In that case transactions by which leaseholds had been transferred to a subsidiary were ignored, and certain interstate wholesale rates were required to be reduced because of an excess of revenues over cost. The Court said:

"The fact that the negotiations between Southwestern and Standard were at arm's length has no bearing on the present problem. The end result is that property has been transferred at a write-up from one of Southwestern's pockets to another. The impact on consumers of utility service of write-ups and inflation of capital assets through inter-company transactions or otherwise is obvious. The prevalence of the practice in the holding company field gave rise to an insistent demand for federal regulation." 324 U.S. at 608, 65 S.Ct. at 841.

See also *Cities Service Gas Co. v. Federal Power Commission*, 424 F.2d 411 (10th Cir. 1969), *cert. dismissed*, 400 U.S. 801, 91 S.Ct. 9, 27 L.Ed.2d 33 (1970); *Cities Services Gas Co. v. Federal Power Commission*, 155 F.2d 694 (10th Cir. 1946), *cert. den.*, 329 U.S. 773, 67 S.Ct. 191, 91 L.Ed. 664 (1946).

■ Even though the direct sales of the parent corporation in the present case are a part of interstate commerce, by reason of the parent's being a natural gas company subject to the federal Natural Gas Act, these sales are essentially local in nature and have been expressly held to be subject to a state gross receipts tax. *Tennessee Natural Gas Lines, Inc. v. Atkins*, 199 Tenn. 468, 287 S.W.2d 67 (1956).

The appellee insists that the Tennessee Public Service Commission has no jurisdiction over the direct sales of its parent to the industrial customers because in 1969 the Commission dismissed proceedings which it had initiated contemplating possible total regulation of the parent. We find the contention of the appellee to be unpersuasive. Whether or not the Commission could or could not regulate all phases of the operations of the parent corporation, we think it unquestionable from the federal cases construing the Natural Gas Act that the Tennessee Commission does have authority to regulate the prices charged in these direct industrial sales. We do not regard the 1969 proceedings as having any significance with respect to the present rate case.

■ Appellee contends further, however, that the Tennessee statutes themselves prohibit the Commission from regulating interstate commerce, citing T.C.A. § 65–403. This statute exempts from state regulation public utilities "engaged in interstate commerce for the government or regulation of which jurisdiction is vested in the interstate commerce commission or other federal board or commission."

We have already noted that the Federal Power Commission only partially regulates the operations of the parent corporation, and certainly both the state statutes and the federal Natural Gas Act contemplate a complete system of dual regulation of the natural gas industry.

Finally it is insisted on behalf of appellee that the industrial sales were contracted by the parent, and the pipelines and facilities built at the expense of the parent, wholly separate from the subsidiary, and at a time when the subsidiary could not financially have afforded the capital outlay necessary to enable it to make these sales.

There is no question but that the two companies have had in the past separate historical development, and we have already stated that we find no illegality whatever in the management decisions which resulted in the present situation. It must be remembered, however, that Nashville Gas Company is wholly owned by Tennessee Natural Gas Lines, Inc. Throughout the record and throughout its brief on appeal, appellee stresses the frequent subsidization of the subsidiary by the parent over the years, and it seems to us that the subsidiary in actuality is nothing more than an operating division of the parent. Management decisions, for legitimate reasons, may have placed the industrial sales and the facilities requisite therefor in the parent company, but this does not prevent a public regulatory body from considering them as part of one operating system and taking them into account in determining the proper rate base and rate structure of the subsidiary. Otherwise, it would be a simple matter, through the device of holding companies, spinoffs, or other corporate arrangements, to place the cream of a utility market in the hands of a parent or an affiliate, and to strip the marketing area of a regulated subsidiary of its most profitable customers. *See Industrial Gas Co. v. Public Utilities Comm'm of Ohio*, 135 Ohio 408, 21 N.E.2d 166 (1939).

■ Throughout the lengthy involved hearings reflected in the record in this case, much information concerning the parent corporation and its sales was introduced into the record. The Commission felt, however, that it did not have enough information about present contracts, depreciation schedules, historical costs and the like to determine the extent to which the industrial sales of the parent should be taken into account in fixing appropriate rates for the subsidiary. We cannot, therefore, at this time know what significance, if any, the Commission will ultimately give to the data which it requested, but we believe that the Commission was entirely justified and acting within its jurisdiction in taking these into account. From such information as is already contained in the record, it appears

that the parent corporation receives substantial profits from these sales, reflecting a net return on the equity capital of the consolidated enterprise not greatly less than that which the Commission found necessary and proper for the subsidiary alone.[4]

■ The Chancellor held that the Commission had violated a fundamental principle of rate making in failing to separate interstate from intrastate operations. He stated that even if the parent and subsidiary were merged into one corporation, such allocation would still have to be made. This, however, overlooks the fact that if the two corporations were merged, there would be no interstate commerce involved at all, because there would be no "sales for resale" and the entire system would be an intrastate distributing company.

While the principle referred to by the Chancellor is a well-recognized and fundamental one, it is usually applied in cases where a regulatory body has only partial jurisdiction over a utility, or where a utility company has separate non-utility operations, not subject to regulation. Such a situation is not presented in the present case, where the subsidiary is entirely subject to regulation by the Tennessee Public Service Commission, and the direct sales of its parent are also subject to such regulation.

The decree of the Chancellor in this case is reversed, insofar as it dealt with the parent-subsidiary relationship, and this cause will be remanded to the Chancery Court, with directions to refer it to the Commission for the production by the Nashville Gas Company of the information ordered to be supplied by the Commission, and further consideration by the Commission after that information has been supplied.

## II. Rate Case Expenses

The Commission authorized the applicant Nashville Gas Company to include in its cost of services $100,000.00 for expenses incurred in counsel fees, consulting fees and other charges in the preparation and presentation of this case. By an exhibit, filed several days after the close of the hearings before the Commission, appellee claimed $203,420.00 in expenses, more than double the amount allowed by the Commission. In its complaint in the chancery court, appellee alleged that it was never given a hearing on its late-filed exhibit, and that the action of the Commission was unreasonable. The Chancellor found no evidence contrary to that contained in the exhibit and allowed the entire amount of claimed expenses, to be amortized over a three-year period.

■ Since we have ordered a remand of this case to the Commission, we think that the item of expenses should also be reconsidered by the Commission, with both the appellee and the commission staff having an opportunity to present such additional evidence as they desire. We are not prepared to accept some of the items contained in the late-filed exhibit, nor do we believe that the Commission was obligated to do so, at least without some explanation or supporting testimony. We think a further hearing on this entire issue would be appropriate.

The decree of the Chancery Court is reversed as to the two issues involved on this appeal, and the cause is remanded to that Court for reference to the Commission as above indicated. Costs incident to the appeal to this Court will be taxed to appellee.

---

4. The general rate increase proposed in this case did not involve residential customers. Its effect, therefore, will be to raise the rates charged to industrial and commercial customers of the subsidiary, and it therefore seems particularly relevant that consideration should be given to the revenues received by the parent from its industrial sales in the same marketing area.

All other costs will be fixed by the Chancellor.

COOPER, C. J., and FONES and BROCK, JJ., concur.

HENRY, J., not participating.