**BELLSOUTH ADVERTISING & PUBLISHING CORPORATION**

v.

**TENNESSEE REGULATORY AUTHORITY.**

and

**BellSouth Advertising & Publishing Corporation**

v.

**Nextlink Tennessee.**

Supreme Court of Tennessee, at Nashville.

July 10, 2002.

---

J. Richard Collier and Julie M. Woodruff, Nashville, Tennessee, for the appellant, Tennessee Regulatory Authority.

Henry Walker, Nashville, Tennessee, for the appellants, AT&T Communications of South Central States, Inc., MCI Worldcom Network Services, Inc., and XO Tennessee, Inc.

Paul S. Davidson and Guilford F. Thornton, Jr., Nashville, Tennessee, Daniel J. Thompson, Jr., Tucker, Georgia, and James F. Bogan, III, Atlanta, Georgia, for the appellee, BellSouth Advertising & Publishing Corporation.

## OPINION

ADOLPHO A. BIRCH, JR., J.,
delivered the opinion of the court, in which
FRANK DROWOTA, III, C.J., E. RILEY
ANDERSON, JANICE M. HOLDER, and
WILLIAM M. BARKER, JJ. joined.

This consolidated appeal presents two
very important issues. They are: (1)

whether the Tennessee Regulatory Authority has the authority to require that the names and logos of local telephone service providers who compete with BellSouth Telecommunications, Inc. be included on the cover of white pages telephone directories published by BellSouth Advertising & Publishing Corporation on behalf of BellSouth Telecommunications, Inc.; and (2) whether the Tennessee Regulatory Authority's decisions in these consolidated cases violate the First Amendment of the Constitution of the United States. For the reasons discussed herein, we hold that the Tennessee Regulatory Authority is authorized to require that the names and logos of competing local telephone service providers be included on the covers of the white pages telephone directories published on behalf of BellSouth Telecommunications, Inc., and that the Tennessee Regulatory Authority's decisions in these two cases do not violate the First Amendment. Accordingly, we reverse the judgment of the Court of Appeals in this consolidated appeal and reinstate the judgments of the Tennessee Regulatory Authority.

## I. Facts and Procedural History

Prior to June 1995, local telephone services in Tennessee were sold to the consumer by monopoly providers. Provision of those services changed dramatically, however, with the Tennessee General Assembly's enactment of 1995 Tenn. Pub. Acts 408 (effective June 6, 1995) (Chapter 408), which comprehensively reformed the rules under which providers of telephone services operate in Tennessee. One of the more notable changes effected by the enactment of Chapter 408 was the abolition of monopolistic control of the local telephone service market and the initiation of open-market competition in the provision of local telephone service.

Under the two above-cited telecommunications statutes, any local telephone service provider who operated as a monopoly under the prior system was thenceforth designated as an "incumbent local exchange telephone company." Likewise, any telecommunications company providing local telephone services in competition with the incumbent local exchange telephone company was designated as a "competing local exchange telephone company."

BellSouth Telecommunications, Inc. (BellSouth), under its former name, South Central Bell, operated as a monopoly in providing local telephone service in Tennessee markets prior to the enactment of Chapter 408. BellSouth, therefore, is an incumbent local exchange telephone company for purposes of the new state and federal laws. Under the former regulatory system, BellSouth was required to publish for each service area a "white pages" telephone directory listing all telephone subscribers within the area. Tenn. Comp. R. & Regs 1220–4–2–.15 (1999). That obligation continues under the new regulatory scheme. *Id.;* Tenn.Code Ann. § 65–4–124(c) (Supp.2001). *See also* 47 U.S.C.A. § 271(c)(2)(B)(viii) (West Supp.2001).[1]

In order to fulfill its obligation to publish a white pages directory, BellSouth contracted with BellSouth Advertising & Publishing Corporation (BAPCO). BAPCO publishes "white pages" and "yellow pages" directories for BellSouth in many different markets. While BellSouth and BAPCO are separate corporations, both are parts of BellSouth Corporation. The "BELLSOUTH" logo is the only logo printed on the white pages and yellow

---

**1.** Section 271(c)(2)(B)(viii) requires any Bell operating company (which includes BellSouth) that seeks to enter the long distance market to list customers of competing local exchange carriers in its white pages directory listings.

pages directories published by BAPCO for BellSouth.

## A. The AT&T Proceeding

AT&T Communications of South Central States, Inc. (AT&T), a competing local exchange telephone company, negotiated an "interconnection agreement" with BellSouth as was permitted under the new regulations. *See* Tenn.Code Ann. § 65–4–124(a) (Supp.2001). As to any issues relating to the telephone directories BAPCO published for BellSouth, however, BellSouth required AT&T to negotiate with BAPCO.

AT&T then opened negotiations with BAPCO for the purpose of including its subscribers within BellSouth's white pages and its name or logo on the cover of the white pages directories in areas in which AT&T competes with BellSouth in the provision of local telephone services. They reached an agreement and entered into a contract in August 1996 on all terms except the directory-cover issue, which was omitted from the contract.

At the time, the Tennessee Regulatory Authority (TRA), pursuant to the federal act, was conducting an arbitration proceeding pertaining to certain issues that had arisen in the implementation of the new competitive system. AT&T filed a petition in the arbitration proceeding asking the TRA to require BAPCO to place AT&T's name and logo on BellSouth's white pages directory covers. In turn, BAPCO filed a petition asking the TRA to declare that BAPCO was not subject to the TRA's jurisdiction and that issues relating to the publication of telephone directories were beyond the scope of the arbitration proceeding, which was governed by federal law. On October 21, 1996, the TRA formally declined to address the issue, finding that "private negotiations are the preferred method of resolving this issue."

On December 16, 1996, after further negotiations had proved fruitless, AT&T filed a petition with the TRA seeking a declaratory order as to the applicability of Tenn. Code Ann. §§ 65–4–104,—117(3),—122(c), and Tenn. Comp. R. & Regs. 1220–4–2–.15 to the white pages directories published by BAPCO on behalf of BellSouth. In its petition, AT&T asked the TRA to join BellSouth and BAPCO as parties to the proceeding, to conduct a contested case hearing on the petition, and to declare that "telephone directories are an essential aspect of the telephone or telecommunications services of telephone utilities such as [BellSouth]; and that the covers of directories, published and distributed by BAPCO on behalf of [BellSouth] which include the names and numbers of customers of AT&T, must be nondiscriminatory and competitively neutral, and either must include the name and logo of AT&T in like manner to the name and logo of [BellSouth], or include no company's name and logo, including 'BellSouth.'"

The TRA voted to convene a contested case hearing and formally made BellSouth and BAPCO parties to the proceeding.[2] The TRA subsequently granted petitions to intervene filed on behalf of MCI Telecommunications, Inc., American Communications Services, Inc., and Nextlink Tennessee, LLC ("Nextlink"), which, like AT&T, are competing local exchange telephone companies serving various local markets in Tennessee.[3]

---

2. Both BellSouth and BAPCO participated in the AT&T declaratory order proceeding before the TRA. BellSouth, however, did not enter an appearance in the pending appeals.

3. MCI Telecommunications, Inc., and Nextlink Tennessee, LLC now operate under new names, MCI WORLDCOM Network Services, Inc. and XO Tennessee, Inc., respectively. For purposes of clarity, each company is re-

After conducting a contested case hearing and considering the testimony and exhibits admitted into evidence, the TRA, in a 2 to 1 decision, ruled in favor of AT&T. In the written declaratory order issued by the majority, it declared that:

> BAPCO, in the publication of basic White pages directory listings on behalf of BellSouth, is required to comply with the directives of the [TRA] and the provisions of Authority Rule 1220–4–2–.15. Further, in the publication of these directory listings on behalf of BellSouth which contain the listings of local telephone customers of AT&T and other competing local exchange providers, BAPCO must provide the opportunity to AT&T to contract with BAPCO for the appearance of AT&T's name and logo on the cover of such directories under the same terms and conditions as BAPCO provides to BellSouth by contract. Likewise, BAPCO must offer the same terms and conditions to AT&T in a just and reasonable manner.

The dissenting TRA Director stated in a separate opinion that he agreed with the majority that the names and logos of competing local exchange telephone companies should be placed on the front cover of the directories published by BAPCO on behalf of BellSouth. He concluded, however, that the rule relied upon by the majority (Rule 1220–4–2–.15), which was promulgated during the time of monopoly local telephone service, did not apply to the new competitive system and that the TRA should initiate a rulemaking proceeding to amend the rule to require that competitors' names and logos appear on the white pages directory covers. BAPCO appealed the decision to the Court of Appeals.[4]

### B. The Nextlink Proceeding

While the appeal of the AT&T proceeding was pending in the Court of Appeals, Nextlink requested that BAPCO include Nextlink's name and logo on the cover of the white pages directory published by BAPCO for Nextlink's service area. BAPCO denied that request. Nextlink subsequently filed a petition asking the TRA for a declaratory order on the issue. Nextlink asked the TRA to order BAPCO to comply with Rule 1220–4–2–.15 as interpreted in the declaratory order entered in the AT&T proceeding. Nextlink asserted that BAPCO is required to afford *all* competing local exchange telephone companies the opportunity to appear on white pages directory covers in their service areas as a result of the TRA's interpretation of the rule in the AT&T declaratory order.

After hearing oral arguments by the parties, the TRA ruled in favor of Nextlink.[5] In pertinent part, it concluded that its interpretation of Rule 1220–4–2–.15 in the AT&T proceeding "must be equally applied to all similarly situated carriers that seek the same relief." The TRA directed BAPCO "to comply with TRA Rule 1220–4–2–.15, as interpreted in its Declaratory Order entered on March 19, 1998 [the AT&T declaratory order]."

BAPCO appealed the decision to the Court of Appeals. The appeals of the

---

ferred to in this opinion by the name it had at the time of the administrative proceedings.

4. *See* Tenn.Code Ann. § 4–5–322(b)(1) (1998) (stating, in pertinent part, "A person who is aggrieved by any final decision of the Tennessee regulatory authority . . . shall file any petition for review with the middle division of the court of appeals.").

5. Like the AT&T declaratory order, the Nextlink order was the result of a 2 to 1 vote. The dissenting TRA Director in the Nextlink proceeding "voted not to support the decision of the majority because the Declaratory Order [from the AT&T proceeding] interpreting TRA Rule 1220–4–2–.15[was] currently pending before the Court of Appeals[.]"

AT&T and Nextlink proceedings were argued separately in the Court of Appeals, although the court subsequently consolidated the two appeals.[6]

The Court of Appeals reversed the two declaratory orders entered by the TRA. A majority of the three-judge panel agreed that the TRA had exceeded its authority under state law in ordering BAPCO to include the names and logos of competing telecommunications companies on the covers of the white pages directories published by BAPCO for BellSouth. The two-judge majority agreed also that the TRA's declaratory orders violated the First Amendment. In a dissenting opinion, the third member of the panel concluded that the TRA's decisions in these two cases were authorized by state law and did not violate First Amendment principles.

The TRA applied to this Court for permission to appeal pursuant to Tenn. R.App. P. 11, and we granted the application. On appeal, we must address two issues: (1) whether the TRA has the authority to require that the names and logos of "competing local exchange telephone companies" be included on the cover of white pages telephone directories published on behalf of BellSouth; and (2) whether imposing such a requirement violates the First Amendment of the United States Constitution.[7] After a painstaking review of the voluminous record and a thorough consideration of the issues, we hold that (1) the TRA is authorized to require that the names and logos of competing local exchange telephone companies be included on the cover of white pages directories published on behalf of BellSouth; and (2) the TRA's decisions in these two cases do not violate the First Amendment. Accordingly, the judgment of the Court of Appeals is reversed, and the judgments of the TRA are reinstated.

## II. Authority of the Tennessee Regulatory Authority

We address first the question whether the TRA has the authority to

---

6. The Court of Appeals stated in the Nextlink case: "Because of the substantial similarity of the issues, this appeal will be consolidated for consideration with *BellSouth Advertising & Publishing Corp. v. Tennessee Regulatory Auth.*, No. 01A01–9805–BC–00248. However, both appeals shall maintain their separate appeal numbers and papers filed in either of these appeals shall bear the appeal number of the proceeding in which they are filed."

7. The Uniform Administrative Procedures Act, Tenn.Code Ann. § 4–5–322(h) (1998), sets forth the analysis to be applied when reviewing decisions of administrative agencies. Section 4–5–322(h) provides:

The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(5) Unsupported by evidence which is both substantial and material in the light of the entire record.
In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. Although BAPCO refers to all five subsections of the above-quoted statute in its brief, the pertinent provisions for purposes of the consolidated appeal are Tenn.Code Ann. §§ 4–5–322(h)(1) and—322(h)(2)—in other words, we must determine whether, under those subsections, the TRA's decisions either were "in violation of constitutional ... provisions" or "in excess of the statutory authority of the agency" and subject to reversal or modification for those reasons.

require that the names and logos of competing telephone companies be included on the cover of white pages directories published on behalf of BellSouth. In defining the authority of the TRA, this Court has held that "[a]ny authority exercised by the [TRA] must be as the result of an express grant of authority by statute or arise by necessary implication from the expressed statutory grant of power." *Tennessee Pub. Serv. Comm'n v. Southern Ry. Co.*, 554 S.W.2d 612, 613 (Tenn.1977). The primary grant of authority to the TRA is located at Tenn.Code Ann. § 65–4–104 (Supp.2001), the provision defining the TRA's general jurisdiction. The statute provides, in pertinent part, that "the authority has general supervisory and regulatory power, jurisdiction, and control over all public utilities, and also over their property, property rights, facilities, and franchises, so far as may be necessary for the purpose of carrying out the provisions of this chapter." *Id.* In the exercise of this general power, Tenn.Code Ann. § 65–4–117 provides, "[T]he authority has the power to . . . [a]fter hearing, by order in writing, fix just and reasonable standards, classifications, regulations, practices or services to be furnished, imposed, observed and followed thereafter by any public utility[.]" Tenn. Code Ann. § 65–4–117(3) (Supp.2001).

In construing these provisions, we are guided both by statute and by the prior decisions of this Court. At the outset,

This chapter shall not be construed as being in derogation of the common law, but shall be given a liberal construction, and any doubt as to the existence or extent of a power conferred on the authority by this chapter or chapters 1, 3 and 5 of this title shall be resolved in favor of the existence of the power, to the end that the authority may effectively govern and control the public utilities placed under its jurisdiction by this chapter.

Tenn.Code Ann. § 65–4–106 (Supp.2001). In addition, this Court has held that the issue whether an administrative agency's action is explicitly or implicitly authorized by the agency's governing statute "is a question of law, not of fact, and this Court's role is to interpret the law under the facts of the case." *Sanifill of Tennessee, Inc. v. Tennessee Solid Waste Disposal Control Bd.*, 907 S.W.2d 807, 810 (Tenn. 1995). Moreover, this Court has observed:

[T]he General Assembly has charged the TRA with the "general supervisory and regulatory power, jurisdiction and control over all public utilities." Tenn. Code Ann. § 65–4–104 (1997 Supp.). In fact, the Legislature has explicitly directed that statutory provisions relating to the authority of the TRA shall be given "a liberal construction" and has mandated that "any doubts as to the existence or extent of a power conferred on the [TRA] . . . shall be resolved in favor of the existence of the power, to the end that the [TRA] may effectively govern and control the public utilities placed under its jurisdiction. . . ." Tenn.Code Ann. § 65–4–106 (1997 Supp.). The General Assembly, therefore, has "signaled its clear intent to vest in the [TRA] practically plenary authority over the utilities within its jurisdiction." *Tennessee Cable Television Ass'n v. Tennessee Public Service Comm'n*, 844 S.W.2d 151, 159 (Tenn. App.1992). To enable the TRA to effectively accomplish its designated purpose—the governance and supervision of public utilities—the General Assembly has empowered the TRA to "adopt rules governing the procedures prescribed or authorized," including "rules of practice before the authority, together with forms and instructions," and "rules implementing, interpreting or making specific the various laws which

[the TRA] enforces or administers." Tenn.Code Ann. § 65–2–102(1) & (2) (1997 Supp.).

*Consumer Advocate Div. v. Greer,* 967 S.W.2d 759, 761–62 (Tenn.1998).

■ Thus, in sum, we interpret the statutes governing the TRA's authority *de novo* as a question of law, and we construe the statutes liberally to further the legislature's intent to grant broad authority to the TRA.

### A. Chapter 408

In Section I of Chapter 408, the General Assembly outlined the public policy underlying the new regulatory scheme which, as stated earlier, altered in a most significant manner the telecommunications industry in Tennessee:

**Declaration of telecommunications services policy.** The general assembly declares that the policy of this state is to foster the development of an efficient, technologically advanced, statewide system of telecommunications services by permitting competition in all telecommunications services markets, and by permitting alternative forms of regulation for telecommunications services and telecommunications services providers. To that end, the regulation of telecommunications services and telecommunications services providers shall protect the interests of consumers without unreasonable prejudice or disadvantage to any telecommunications services provider; universal service shall be maintained; and rates charged to residential customers for essential telecommunications services shall remain affordable.

Tenn.Code Ann. § 65–4–123 (Supp.2001).

Another section of Chapter 408, now codified at Tenn.Code Ann. § 65–4–124 (Supp.2001), provides, in pertinent part:

(a) All telecommunications services providers shall provide non-discriminatory interconnection to their public networks under reasonable terms and conditions; and all telecommunications services providers shall, to the extent that it is technically and financially feasible, be provided desired features, functions and services promptly, and on an unbundled and non-discriminatory basis from all other telecommunications services providers.

(b) Prior to January 1, 1996, the commission shall, at a minimum, promulgate rules and issue such orders as necessary to implement the requirements of subsection (a) and to provide for unbundling of service elements and functions, terms for resale, interLATA presubscription, number portability, and packaging of a basic local exchange telephone service or unbundled features or functions with services of other providers.

(c) These rules shall also ensure that all telecommunications services providers who provide basic local exchange telephone service or its equivalent provide each customer a basic White Pages directory listing....

Two of the provisions in Tenn.Code Ann. § 65–4–124 are especially relevant to the pending cases: subparagraph (b) requires the TRA to "promulgate rules *and issue such orders as necessary* to implement the provisions of subsection (a)" (emphasis added); and subparagraph (c) requires the TRA to "ensure that all telecommunications services providers who provide basic local exchange telephone service ... provide each customer a basic White Pages directory listing...."

The TRA relies on the two foregoing provisions of Chapter 408 (Tenn.Code Ann. §§ 65–4–123 and—124) to support its contention that its declaratory orders did not exceed the agency's statutory authority.

In addition to its reliance upon the above-enumerated statutes, the TRA relies upon Rule 1220–4–2–.15 as its authority for the declaratory orders issued in the case under submission. Mindful of the provisions of Chapter 408, we now consider Rule 1220–4–2–.15 in the context of TRA's contentions.

### B. Rule 1220–4–2–.15

This rule was originally promulgated by the TRA's predecessor agency, the Public Service Commission, long before the enactment of Chapter 408.[8] The rule provides, in pertinent part:

1220–4–2–.15 DIRECTORIES–ALPHABETICAL LISTING (WHITE PAGES)

(1) Telephone directories shall be regularly published, listing the name; address and telephone number of all customers, except public telephones and number unlisted at customer's request.

(2) Upon issuance, a copy of each directory shall be distributed to all customers served by that directory and a copy of each directory shall be furnished to the Commission upon request.

(3) The name of the telephone utility, the area included in the directory and the month and year of issue shall appear on the front cover....

In its declaratory orders in these two proceedings, the TRA interpreted Rule 1220–4–2–.15 to require that the names and logos of competing local exchange telephone companies be placed on the covers of the white pages directories that BAPCO publishes for BellSouth, the incumbent local exchange telephone company that is required by law to publish a white pages directory. As we stated in *Jackson Express, Inc. v. Tennessee Public Service Commission,* "Generally, courts must give great deference and controlling weight to an agency's interpretation of its own rules. A strict standard of review applies in interpreting an administrative regulation, and the administrative interpretation 'becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" 679 S.W.2d 942, 945 (Tenn. 1984).

We therefore must give "great deference" to the TRA's interpretation of Rule 1220–4–2–.15, and the TRA's interpretation "becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." In addition, we review the agency's interpretation in light of the statutes, discussed above, governing the TRA. Referring again to those statutes, we note that the General Assembly has provided that the laws governing the TRA shall be given "a liberal construction" and has mandated that "any doubts as to the existence or extent of a power conferred on the [TRA] ... shall be resolved in favor of the existence of the power, to the end that the [TRA] may effectively govern and control the public utilities placed under its jurisdiction...." Tenn.Code Ann. § 65–4–106. The General Assembly also has empowered the TRA to "adopt rules governing the procedures prescribed or authorized," including "rules implementing, interpreting or making specific the various laws which [the TRA] enforces or administers." Tenn.Code Ann. § 65–2–102(2) (Supp.2001). Finally, the legislature has stated that "[i]n addition to any other jurisdiction conferred, the authority shall have the original jurisdiction to investigate, hear and enter appropriate orders to resolve all contested issues of fact

---

8. The Administrative History for Rule 1220–4–2–.15 states: "Original rule certified May 9, 1974. Amendment filed August 18, 1982; effective September 17, 1982. Amendment filed November 9, 1984; effective December 9, 1984."

or law arising as a result of the application of Acts 1995, ch. 408." Tenn.Code Ann. § 65–5–210(a) (Supp.2001).

As stated, Rule 1220–4–2–.15 requires that the "name of the telephone utility, the area included in the directory and the month and year of issue shall appear on the front cover[.]" We have considered Tenn.Code Ann. §§ 65–2–102(2), 65–4–104, 65–4–106 and the pertinent provisions of Chapter 408. Additionally, we have accorded the TRA's interpretation of its own rules the deference required. In so doing, we fail to find any demonstration that the TRA has acted in excess of its authority in requiring that the names of competing local exchange providers be included on the cover of BellSouth's white pages directories. The declaratory orders as promulgated serve to "resolve ... contested issues of fact or law arising as a result of the application of Acts 1995, ch. 408." Accordingly, the declaratory orders are expressly authorized by Tenn.Code Ann. § 65–5–210(a).

### III. TRA's Jurisdiction over BAPCO

◾ While it is abundantly clear that the TRA has jurisdiction over BellSouth, a regulated public utility, BAPCO suggests that because it is not a public utility, it is beyond the reach of the TRA.

In its declaratory orders, the TRA required that BAPCO provide AT&T and Nextlink the opportunity "to contract with BAPCO for the appearance of AT&T's [and Nextlink's] name[s] and logo[s] on the cover of such directories under the same terms and conditions as BAPCO provides to BellSouth by contract."

While we recognize that this issue could have been avoided had the TRA ordered BellSouth, as distinct from BAPCO, to implement the TRA's interpretation of Rule 1220–4–2–.15, we nevertheless conclude that the TRA did not err in ordering BAP-

CO to allow competing service providers to contract with BAPCO to be included on the covers of BellSouth's white pages directories. Our conclusion is based upon the particular facts of these related proceedings and upon legal precedent governing public utilities and their non-utility subsidiaries and affiliates.

Factually, much of the testimony admitted into evidence during the AT&T proceeding pertained to BAPCO's role in publishing directories on behalf of BellSouth. The testimony of a number of witnesses can be summarized by quoting a single sentence of the testimony of one witness employed by BAPCO: "[a]ll editorial, publishing, and business decisions [regarding the directories] are under BAPCO's exclusive control." R., Vol. 16, p. 37 (Testimony of R.F. Barretto, Director–Local Exchange Carrier Interface for BAPCO). Moreover, BellSouth admitted in its answer to AT&T's petition for a declaratory order that "during the course of the negotiations between AT&T and [BellSouth] for an interconnection agreement ... [BellSouth] properly maintained that negotiations with respect to telephone directories were to be conducted with BAPCO." R., Vol. I, p. 35. Likewise, BAPCO stated in its answer to the AT&T petition that "[t]he issues raised in the AT&T Petition should be resolved between AT&T and BAPCO[.]" R., Vol. I, p. 45.

With regard to precedent, we considered in *Tennessee Public Service Commission v. Nashville Gas Co.*, an analogous issue concerning a parent corporation and its subsidiary in the context of rate-making. 551 S.W.2d 315 (Tenn.1977). In permitting the TRA's predecessor, the Public Service Commission, to consider pertinent financial data of the parent corporation (not a public utility regulated by the Commission) in setting the rates for the subsid-

iary corporation (a public utility regulated by the Commission), we stated:

> [A] regulatory body, such as the Public Service Commission, is not bound in all instances to observe corporate charters and the form of corporate structure or stock ownership in regulating a public utility, and in fixing fair and reasonable rates for its operations. The filing of consolidated reports by parent and subsidiary corporations, both for tax purposes and regulatory purposes, is so commonplace as to be completely familiar in modern law and practice. Considerations of "piercing the veil," which are involved in cases involving tort, misconduct or fraud, are largely irrelevant in the regulatory and revenue fields. In order for taxing authorities to obtain accurate information as to revenues and expenses, the filing of consolidated tax returns by affiliated corporations is frequently required, and rate-making and regulatory bodies frequently can and do consider entire operating systems of utility companies in determining, from the standpoint both of the regulated carrier and the consuming public fair and reasonable rates of return.

*Id.* at 319–20. Continuing, we stated that holding otherwise would allow the regulated utility, "through the device of holding companies, spinoffs, or other corporate arrangements, to place the cream of a utility market in the hands of a parent or an affiliate, and to strip the marketing area of a regulated subsidiary of its most profitable customers." *Id.* at 321.

Although the cases under submission are not rate-making proceedings, we conclude that the reasoning and the principles stated in *Nashville Gas* are applicable thereto. BellSouth is a public utility regulated by the TRA and is required by law to provide a white pages directory in its market areas. BellSouth has contracted that duty to BAPCO, an affiliated company within BellSouth's parent corporation. Thus, for purposes of these two declaratory order proceedings, we conclude that the TRA had jurisdiction over BAPCO. Were we to conclude otherwise, BellSouth could escape the legal responsibilities thrust upon it by Rule 1220–4–2–.15. Because BellSouth delegated its responsibility over the white pages directories to BAPCO, and because BAPCO has exclusive control over the directories, we conclude that the TRA has jurisdiction over BAPCO for the purposes of these two proceedings.

## IV. First Amendment Issue

Next, the TRA contends that the Court of Appeals erred in holding that the TRA's decisions in these two cases amount to "compelled speech" and therefore violate the First Amendment.[9] For the reasons set out below, we hold that the TRA's orders do not violate the First Amendment.

■ The TRA's orders in these two proceedings implicate two lines of First Amendment cases: those pertaining to "compelled speech" and those pertaining to "commercial speech." The parties focus most heavily upon the former line, so we begin with an analysis of the law regarding compelled speech.

The United States Supreme Court, in its cases involving compelled speech, has held that the First Amendment not only bars the government from prohibiting protected speech, it also may bar the government from compelling the expression of certain views or the subsidization of speech to which an individual objects. *United States v. United Foods, Inc.,* 533 U.S. 405, 410,

---

9. The First Amendment applies to the States through the Fourteenth Amendment. *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975).

121 S.Ct. 2334, 150 L.Ed.2d 438 (2001); *see also Lehnert v. Ferris Faculty Ass'n,* 500 U.S. 507, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991); *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977). Although the Court's compelled speech cases may be divided into numerous categories, the parties rely most heavily on those cases involving laws or regulations requiring individuals to contribute financially to speech with which they disagree. This category of cases is typified by *Abood v. Detroit Board of Education*[10] and *Keller v. State Bar of California.*[11] In that pair of cases, the Court set out a "germaneness" test, under which compelled contributions do not offend First Amendment principles so long as they are used for activities that are germane to the organization's central purpose.

The parties focus upon two separate cases discussing *Abood* and *Keller* in the context of compelled financial contributions to commercial speech.[12] The TRA, in contending that the Court of Appeals erred in reversing its orders on First Amendment grounds, relies on *Glickman v. Wileman Bros. & Elliott, Inc.*[13] Conversely, BAPCO, contending that the First Amendment analysis of the Court of Appeals is correct, relies upon *United States v. United Foods, Inc.* Both *Glickman* and *United Foods* involve federal programs administered by the Secretary of Agriculture, in which the Secretary imposed mandatory assessments on two different agricultural industries for funding generic advertising for the respective industries.

In *Glickman,* growers, handlers, and processors of California tree fruits challenged marketing orders promulgated by the Secretary. The orders imposed mandatory assessments on the petitioners to cover the expenses of administering the orders, including the cost of generic advertising of California nectarines, plums, and peaches. The petitioners asserted that the government-mandated financial contribution to the generic advertising campaign violated their First Amendment rights. After summarizing the components of the regulatory scheme of which the marketing orders were a part, the Court concluded that "[t]hree characteristics of the regulatory scheme at issue distinguish it from laws that we have found to abridge freedom of speech protected by the First Amendment." *Id.* 521 U.S. at 469, 117 S.Ct. 2130. The Court continued:

> First, the marketing orders impose no restraint on the freedom of any producer to communicate any message to any audience. *Second, they do not compel any person to engage in any actual or*

---

**10.** 431 U.S. 209, 235–36, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) (holding that teachers' compulsory union dues could not be used for political or ideological purposes that were not "germane" to the union's duties as a collective-bargaining representative).

**11.** 496 U.S. 1, 14, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990) (holding that a state bar's use of compulsory dues to finance political activities with which the petitioners disagreed violated their right to free speech when the expenditures were not "necessarily or reasonably incurred for the purpose of regulating the legal profession or 'improving the quality of [legal services]' ").

**12.** The TRA argues in the alternative that its two orders meet the test set forth in *Central Hudson Gas & Electric Corp. v. Public Service Commission of N.Y.,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). BAPCO argues in response that the orders do not meet the requirements of *Central Hudson.* The application of *Central Hudson* is discussed later in this opinion.

**13.** 521 U.S. 457, 117 S.Ct. 2130, 138 L.Ed.2d 585 (1997).

*symbolic speech.* Third, they do not compel the producers to endorse or to finance any political or ideological views. *Id.* at 469–70, 117 S.Ct. 2130 (emphasis added). The Court then found that the assessments under the marketing orders did not constitute compelled speech. As the Court stated:

> Our compelled speech case law … is clearly inapplicable to the regulatory scheme at issue here. The use of the assessments to pay for advertising does not require respondents to repeat an objectionable message out of their own mouths, require them to use their own property to convey an antagonistic ideological message, force them to respond to a hostile message when they "would prefer to remain silent," or require them to be publicly identified or associated with another's message.

*Id.,* 521 U.S. at 470–71, 117 S.Ct. 2130 (citations omitted). Applying the *Abood–Keller* "germane[ness]" test, the Court concluded that the generic advertising program was "unquestionably germane to the purposes of the marketing orders" and that the assessments were not used to fund ideological activities. *Glickman,* 521 U.S. at 473, 117 S.Ct. 2130.

Superficially, *United Foods* appears to be similar to *Glickman.* *United Foods* involved a mandatory assessment imposed by the Secretary of Agriculture on handlers of fresh mushrooms, to be used primarily for funding advertising for the mushroom industry. Despite the facial similarity between the two cases, however, the Court in *United Foods* distinguished *Glickman* on the grounds that the compelled assessments in *Glickman* were part of a broad regulatory scheme, whereas the assessments in *United Foods* were not. Indeed, the *United Foods* Court found that the only program served by the compelled contributions was the very advertis-

ing scheme in question. 533 U.S. at 411–12, 121 S.Ct. 2334. The Court then applied the *Abood–Keller* principles to the mandatory assessments and ultimately held that they violated the First Amendment.

Having reviewed this authority, however, we cannot conclude that the cases cited by either of the parties are completely apposite to the case under submission. The principles stated in *Abood* and *Keller,* and in the later cases in which *Abood* and *Keller* have been applied (including *Glickman* and *United Foods* ), are limited to cases involving compelled *contributions* to speech. The TRA's orders, on the other hand, effectively require BAPCO to engage in *actual speech.* The distinction, we conclude, is significant. *Cf. Glickman,* 521 U.S. at 469, 117 S.Ct. 2130 (stating that the marketing orders did not "compel any person to engage in any actual or symbolic speech"); and 521 U.S. at 470–71, 117 S.Ct. 2130 (stating that the Court's "compelled speech case law … is clearly inapplicable to the regulatory scheme at issue here. The use of the assessments to pay for advertising does not require respondents to repeat an objectionable message out of their own mouths . . . .").

Because the *Abood–Keller* standards applied in *Glickman* and *United Foods* are inapposite, we next must determine what standard to apply to these two cases. Consequently, our analysis takes us to the United States Supreme Court case law involving commercial speech.

■ Commercial speech, that is, expression related solely to the economic interests of the speaker and his or her audience, is constitutionally protected under the First Amendment, as applied to the States under the Fourteenth Amendment. *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980);

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). The Supreme Court, however, has distinguished between commercial speech and other types of speech in that "[t]he Constitution ... accords a lesser protection to commercial speech than to other constitutionally protected expression." *Central Hudson,* 447 U.S. at 562–63, 100 S.Ct. 2343; *see also United Foods,* 533 U.S. at 409, 121 S.Ct. 2334.

In *Central Hudson,* the Supreme Court adopted a four-part analysis to be used in determining whether a law impermissibly restricts commercial speech. The Court stated:

At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

447 U.S. at 566, 100 S.Ct. 2343.

The *Central Hudson* test, however, has been a subject of considerable debate. Although the Court has preserved the test in cases involving *restrictions* on commercial

speech,[14] it has not applied the test in cases involving *compelled* commercial speech or *compelled financial support of commercial speech. See Glickman,* 521 U.S. at 474, 117 S.Ct. 2130 (holding that the Court of Appeals erred in relying on *Central Hudson* for the purpose of testing the constitutionality of government-mandated assessments for promotional advertising).[15]

In *Walker v. Board of Professional Responsibility of the Supreme Court of Tennessee,* this Court noted that the distinction between restricted speech cases and compelled speech cases is significant, stating, "The fact that a regulation requires disclosure rather than prohibition tends to make it less objectionable under the First Amendment." 38 S.W.3d 540, 545 (Tenn. 2001). Accordingly, we looked to the more forgiving standard set forth by the United States Supreme Court in *Zauderer v. Office of the Disciplinary Counsel of the Supreme Court of Ohio,* 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985), as the defining test for First Amendment analysis of compelled speech cases. *Walker,* 38 S.W.3d at 545.[16] As we noted in *Walker, Zauderer* states:

We do not suggest that disclosure requirements do not implicate the advertiser's First Amendment rights at all. We recognize that unjustified or unduly burdensome disclosure requirements

---

**14.** *See Greater New Orleans Broad. Ass'n v. United States,* 527 U.S. 173, 184, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999); *see also United Foods,* 533 U.S. at 409–10, 121 S.Ct. 2334 (noting criticism of *Central Hudson* test but declining to "enter into the controversy").

**15.** The *United Foods* Court noted that the *Central Hudson* test has been criticized, but did not revisit the *Central Hudson* test and did not apply it to the mandatory assessments at issue in that case. The Court simply noted that the mandatory assessments could not be

sustained under *any* of the Court's precedents. *Id.* 533 U.S. at 410, 121 S.Ct. 2334.

**16.** Notably, several federal circuits also have applied the *Zauderer* test to governmental regulations that require disclosure of information. *See, e.g., Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n,* 233 F.3d 981, 994 (7th Cir.2000); *Commodity Futures Trading Comm'n v. Vartuli,* 228 F.3d 94, 108 (2d Cir.2000); *Consolidated Cigar Corp. v. Reilly,* 218 F.3d 30, 54 (1st Cir.2000).

might offend the First Amendment by chilling protected commercial speech. But we hold that an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the state's interest in preventing deception of consumers.

*Id.* at 546 (quoting *Zauderer*, 471 U.S. at 651, 105 S.Ct. 2265). In other words, "under current law—as announced in *Zauderer*—as long as the disclosure requirement is reasonably related to the state's interest in preventing deception of consumers, and not unduly burdensome, it should be upheld." *Id.*

Although both the *Zauderer* and *Walker* cases specifically involved application of First Amendment principles to attorney advertising, we noted in *Walker* that attorney advertising is considered commercial speech under the First Amendment. *Id.* at 544. We see no reason why the compelled commercial speech at issue in *Zauderer* and *Walker* should be governed by a different standard than the compelled commercial speech at issue here; accordingly, we now apply the *Zauderer* standard to the case under submission.

An application of *Zauderer* to the pending appeals requires that we determine:

1. Whether the TRA's disclosure requirement is reasonably related the state's interest in preventing deception of consumers; and

2. Whether the disclosure requirement is unduly burdensome.

We first address the relationship between the TRA's orders and the state's interest in preventing deception of consumers. This interest in preventing deception presents itself in a different context than is seen in the attorney advertising regulations of *Zauderer* and *Walker*. The rules in *Zauderer* and *Walker* compelled attorneys to disclose additional information about themselves, whereas the TRA's orders compel BellSouth to disclose information about the identity of its competitors. The ultimate object of the regulations, however, is the same: to inform consumers. In other words, BellSouth is compelled to disclose information which will prevent consumers from mistakenly believing that no alternative providers of telecommunications services are available.

Richard Guepe, District Manager in the Law & Governmental Affairs organization of AT&T, in his testimony before the TRA, addressed the value of having the names and logos of the competing local exchange telephone companies on the cover of the white pages directory published on behalf of BellSouth:

> The cover of the phone book is a simple, direct, and very important means to communicate to Tennessee consumers. To be effective, consumer communication must be simple, it must be clear, and it must be repeated. That is why the phone book cover is important. Consumers see it often. The cover of the book does tell the consumer what's inside. They read it by its symbols, not by its fine print. We are asking that the cover of the phone book tell Tennessee consumers very clearly that they have a choice in the local service market.

R., Vol. 15, p. 64. As explained by Guepe, the TRA's two declaratory orders directly advance competition in the provision of local telephone services by effectively informing consumers as to the existence of alternative local telephone services. Thus, we conclude that the orders are reasonably related to the state's asserted interest.

The second step of the *Zauderer* test is to determine whether the TRA's orders are unduly burdensome. To assist in this determination, the United States Supreme Court has provided guidance. In *Board of*

*Trustees of the State University of New York v. Fox*, the Supreme Court held that governmental restrictions upon commercial speech are not invalid merely because they go beyond the least restrictive means capable of achieving the desired end. *Fox*, 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). The Court stated:

> [W]hile we have insisted that " 'the free flow of commercial information is valuable enough to justify imposing on would-be regulators the costs of distinguishing ... the harmless from the harmful,' " we have not gone so far as to impose upon them the burden of demonstrating that the distinguishment is 100% complete, or that the manner of restriction is absolutely the least severe that will achieve the desired end. What our decisions require is a " 'fit' between the legislature's ends and the means chosen to accomplish those ends,"—a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is "in proportion to the interest served"; that employs not necessarily the least restrictive means but ... a means narrowly tailored to achieve the desired objective. Within those bounds we leave it to governmental decision-makers to judge what manner of regulation may best be employed.

*Fox*, 492 U.S. at 480, 109 S.Ct. 3028 (citations omitted).

Under *Fox*, the TRA is the proper body to determine "the manner of regulation that may best be employed" to fulfill the government's objective. *Id.* Thus, this Court may not determine whether the manner of regulation chosen by the TRA should have been more or less restrictive. Ours is merely to review the chosen regulation and determine whether it is unduly burdensome.

Reviewing the record thoroughly in light of the principles articulated in *Fox*, we are firmly convinced that the TRA's decisions requiring the logos and names of competing service providers to be displayed on the directory covers do not impose an inordinate burden on BellSouth. As discussed *supra*, the governmental interest in this case is important, indeed, for informing consumers about their choices in the local telecommunications service market is a fundamental aspect of promoting free competition. Moreover, the government's chosen means to advance its goals, the requirement that logos of competing telecommunications service providers be displayed on equal footing with BellSouth's logo, does not substantially affect BellSouth's ability to communicate its own speech to customers in the market. Given the significant weight of the governmental interest and the relatively narrow impact of the orders in this case, we conclude that the TRA's orders are not unduly burdensome.

Concluding the *Zauderer* analysis, we find that the TRA's orders are reasonably related to the state's substantial interest in preventing the deception of consumers, and we further find that the orders under review directly advance the state's interest without imposing an excessive burden. Thus, we hold that the TRA's orders survive *Zauderer* scrutiny and consequently are valid under the First Amendment.

## V. BAPCO's Additional Arguments

BAPCO raises two other arguments in its brief; however, neither was considered and decided as an issue by the TRA or by the Court of Appeals. We find that both arguments are without merit.

In its first argument, BAPCO contends that the TRA's orders amount to a confiscatory taking in violation of the state and federal constitutions. BAPCO's claim is

based upon a factual premise that the TRA's orders require BAPCO to display AT&T's name and logo (and those of other competing providers) without compensation. BAPCO's factual premise simply is incorrect. The TRA ordered BAPCO to permit AT&T and, as a result of the Nextlink proceeding, all other competing local exchange telephone companies to contract with BAPCO for the display of their names and logos on the covers of the white pages directories "under the same terms and conditions as BAPCO provides to BellSouth by contract." It is true that the evidence shows BellSouth was not paying BAPCO at the time of the hearing for displaying the BellSouth logo on the directory covers, but nothing in the TRA's orders precludes BAPCO from charging BellSouth for displaying BellSouth's name and logos on the directory covers. The TRA's orders merely require BAPCO to contract with the competing providers "under the same terms and conditions as BAPCO provides to BellSouth by contract." BAPCO therefore has a choice—it may charge BellSouth for displaying BellSouth's name and logo, in which case BAPCO also may charge the competing companies, or it may choose not to charge BellSouth, in which case it may not charge the other companies. For this reason, BAPCO's confiscatory-taking argument is without merit.

BAPCO's second argument is that the TRA's orders violate BAPCO's trademark rights. This argument is based upon the erroneous premise that the "BELL-SOUTH" trademark displayed on the directory covers is intended to represent BAPCO, not BellSouth. Throughout the administrative proceedings, BAPCO claimed that the "BELLSOUTH" trademark on the covers indicates that the directories are published by BAPCO and that the trademark only coincidentally represents BellSouth. The TRA rejected BAPCO's factual argument on this point and found that the "BELLSOUTH" trademark on the directories referred to BellSouth, the incumbent local exchange telephone company. The record fully supports the TRA's factual finding on this point. Moreover, we note that BAPCO has failed to cite any authority that would support striking down a regulatory agency's actions over a regulated utility on trademark-infringement grounds. For these reasons, we find that BAPCO's trademark issue is without merit.

## VI. Conclusion

Accordingly, we hold that the TRA's two declaratory orders are not in excess of the statutory authority of the agency and that the TRA had jurisdiction over BAPCO for the purposes of these proceedings. In addition, we hold that the orders do not violate the First Amendment. Therefore, we reverse the judgment of the Court of Appeals in these two cases and reinstate the judgments of the Tennessee Regulatory Authority.

The costs are taxed to BellSouth Advertising & Publishing Corporation, for which execution may issue if necessary.