# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
September 27, 2011 Session

## CONSUMER ADVOCATE & PROTECTION DIVISION OF THE OFFICE OF THE ATTORNEY GENERAL OF TENNESSEE
### v.
## TENNESSEE REGULATORY AUTHORITY

**An Appeal from the Tennessee Regulatory Authority**
**No. 09-00183**

---

**No. M2011-00028-COA-R12-CV - Filed May 30, 2012**

---

This is an appeal from an order of the Tennessee Regulatory Authority ("TRA"). The appeal was filed by the Consumer Advocate and Protection Division of the Office of Tennessee's Attorney General. It challenges the TRA's authority to allow a gas company to recover attorney fees that were incurred in a proceeding before the TRA that did not involve rate-making, and the TRA's authority to order that the attorney fees be recovered from asset management funds. We conclude that the TRA has the authority to order that such litigation fees be recovered as any other reasonable and prudent operating expense of the utility, and that the TRA acted within its authority in ordering that the fees be paid out of asset management funds. The TRA's decision, therefore, is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the
Tennessee Regulatory Authority is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

Robert E. Cooper, Jr., Attorney General & Reporter; Joseph F. Whalen, Associate Solicitor General; and Vance L. Broemel, Assistant Attorney General, for the Petitioner/Appellant Consumer Advocate & Protection Division of the Office of the Attorney General of Tennessee

J. Richard Collier and Kelly Cashman-Grams for the Respondent/Appellee Tennessee Regulatory Authority

J. W. Luna and Jennifer L. Brundige, Nashville, Tennessee, for the Respondent/Appellee Chattanooga Gas Company

Henry Walker, Nashville, Tennessee, for the Petitioner/Appellee Chattanooga Regional Manufacturer's Association

# OPINION

Before we outline the facts and proceedings at issue in this appeal, a brief overview of the parties, terminology, and regulatory framework is helpful to an understanding of the issues on appeal.

## BACKGROUND

Respondent/Appellee Chattanooga Gas Company ("the Gas Company") is a corporation engaged in the business of transporting, distributing, and selling natural gas in Chattanooga and Cleveland, Tennessee, and in other portions of Hamilton and Bradley Counties as well. Although the Gas Company is a for-profit corporation, it is also a public utility, and its operations are subject to the jurisdiction of Respondent/Appellee Tennessee Regulatory Authority ("TRA"). *See* Tenn. Code Ann. § 65-4-101, *et seq.*

Utility customers in the areas served by the Gas Company pay it to provide them with natural gas via the customers' monthly bills. The Gas Company's rates and charges must be set forth in tariffs filed by the Gas Company with the TRA, and the Gas Company can charge the customer only the rates and charges that are set forth in a filed and effective tariff. *See* Tenn. Code Ann. § 65-5-102; Tenn. Comp. R. & Regs. 1220-4-1-.03. The tariff in this case is a multipage loose-leaf document "so that changes [can] be made by reprinting and inserting a single leaf" when the tariff is revised. *See* Tenn. Comp. R. & Regs. 1220-1-4-.02. Thus, a customer's monthly bill reflects the sum of all of the charges that the company is entitled to charge, as set forth in the tariff.

The two main components of the Gas Company's monthly bill charges are (1) the *cost of distributing the gas* to the consumer, and (2) the *cost of the gas* commodity itself, which includes the cost of storing and transporting that commodity to the Gas Company's distribution system for available use. The charges for these two components are set forth in the tariff and regulated by the TRA. However, each component is governed by a different set of rules. This is explained in more detail below.

## The Distribution of Gas – Base Rates

By statute, the Gas Company is permitted to charge a reasonable base rate for the service of distributing natural gas to the consumer. Tennessee Code Annotated § 65-5-101 gives the TRA the authority "to fix just and reasonable individual rates, joint rates, tolls, fares, charges or schedules thereof, as well as commutation, mileage, and other special rates" charged by any public utility. The utility is permitted to set base rates that allow it to recover its operating expenses and earn a profit from the consumer from the operation of its business; in overseeing these base rates, the TRA is required to balance the interests of the utility with the interests of Tennessee consumers. *See Tenn. Am. Water Co. v. Tenn. Reg. Auth.*, No. M2009-00553-COA-R12-CV, 2011 WL 334678, at *15 (Tenn. Ct. App. Jan. 28, 2011). On one hand, the rate approved by the TRA must provide the utility the opportunity to earn a just and reasonable return on its investment; on the other hand the rate must not be exorbitant, so as to avoid the exploitation of consumers. *See Bluefield Water Works & Improvement Co. v. Public Serv. Comm'n of the State of West Va.*, 262 U.S. 679, 690 (1923). "A rate need only fall within the 'zone of reasonableness' . . . that takes into consideration the interests of both the consumer and the utility." *Tenn. Cable Television Ass'n. v. Tenn. Pub. Serv. Comm'n*, 844 S.W.2d 151, 159 (Tenn. Ct. App. 1992).

If the public utility wants to increase its base rates, because of increased expenses, decreased revenues, or any other reason, it must file a revised tariff and a petition with the TRA to revise the existing rates at least thirty days before the effective date of the new rates. Tenn. Comp. R. & Regs. 1220-4-1-.03 to .06; *see* Tenn. Code Ann. § 65-5-103.[1] The TRA then has several options. It can simply allow the revised rate to go into effect by taking no action. In the alternative, the TRA has the authority to suspend the rate increase pending an investigation into whether the rate increase is just and reasonable. *See* Tenn. Code Ann. § 65-5-103. The TRA also has the option to convene a contested case and allow interested parties to intervene in the matter to oppose the rates. If the TRA conducts an investigation or contested hearing and then authorizes a rate revision other than the one requested by the public utility, the utility must file a revised tariff that sets out the rates authorized by TRA. Only after the revised tariff becomes effective can the public utility charge consumers the increased rates. The revised tariff remains in effect until it is modified. *See* Tenn. Code Ann. § 65-5-103; Tenn. Comp. R. & Regs. 1220-4-1-.03 to .06; *see also City of Chattanooga v. Tenn. Reg. Auth.*, No. M2008-01733-COA-R12-CV, 2010 WL 2867128, at *1 (Tenn. Ct. App. July 21, 2010). In utility regulatory parlance, a proceeding before the TRA that involves the setting of base rates is commonly referred to as a "rate case."

---

[1]A public utility is prohibited from raising the rates it charges consumers unless it files a petition with the TRA. *See City of Chattanooga v. Tenn. Reg. Auth.*, No. M2008-01733-COA-R12-CV, 2010 WL 2867128, at *1 (Tenn. Ct. App. July 21, 2010) (citing Tenn. Code Ann. § 65-5-103).

In a rate case, the TRA will generally consider the utility's revenues and operating expenses for a given test period. It then uses that information to predict the rate of return that the revised rate structure will produce in the reasonably foreseeable future. To evaluate the requested rate, the TRA takes into consideration the estimated effect of predicted revenues, expenses, and investments. The attorney fees that the public utility reasonably anticipates will be incurred in the rate case itself are called "litigation expenses" or "Rate Case Expenses."[2] These litigation expenses are recoverable as any other business expense in the rate case; that is, the expenses are built into the revised rates. In this way, the TRA permits the utility to recover from consumers the reasonable and prudent litigation expenses incurred in the regulatory proceeding through the setting of the utility's rates going forward. ***See Tenn. Am. Water Co. v. Tenn. Reg. Auth.***, No. M2009-00553-COA-R12-CV, 2011 WL 334678, at *26-27 (Tenn. Ct. App. Jan. 28, 2011). The parties involved in this appeal do not challenge the authority of the TRA to permit the utility to recover litigation expenses in this manner in a rate case.[3]

## Cost of Gas

The other main component of the Gas Company's monthly charges is the cost of gas. The Gas Company must purchase gas and have it delivered to its own distribution system at the level needed to meet the full natural gas supply needs of the consumers.[4] ***See*** Tenn. Code Ann. § 65-4-114 & 115. Generally, the cost of gas is charged to consumers on a pass-through basis. This means that the utility does not earn a profit from the cost of gas; the consumer pays the wholesale price, or what the utility paid for the gas.[5] The cost of gas is calculated by using the mechanism set forth in the Purchased Gas Adjustment ("PGA") Rules, found in Tenn. Comp. R. & Regs. 1220-4-7 of the Rules of the Tennessee Regulatory

---

[2]As used in this Opinion, the phrase "litigation expenses" includes attorney fees unless otherwise indicated.

[3]As stated by the Consumer Advocate in its appellate brief: "In general, litigation costs in rate cases are treated similarly to a number of other expenses for which a utility can seek recovery in a rate case, including such items as wages and salaries, pensions, depreciation, and administrative costs." Appellant's Brief at pp. 14-15 (citing ***Tenn. Am. Water Co.***, 2011 WL 334678, at *26-27).

[4]The Gas Company has about 62,000 "firm customers." As defined in the Gas Company's tariff, "firm customers" are customers for whom the Gas Company has a firm obligation to supply gas that is not ordinarily subject to interruption or curtailment.

[5]This is in contrast to the cost of distributing the gas. As noted above, the Gas Company is permitted to earn a profit in the rate charged to the consumer for the cost of distributing the gas.

Authority.[6]  Under the PGA Rules, the Gas Company is directed to adjust its charges to recover the cost of gas (which is not included in the utility's rate base) from consumers through their monthly bills.  The PGA Rules seek to ensure that the Gas Company neither over-collects nor under-collects gas costs from consumers.[7]  *See* PGA Rule 1220-4-7-.02(1) & 1220-4-7-.03(1)(a)5(iv).

The PGA mechanism for calculating the cost of gas is quite complicated; it involves intricate formulas that take into consideration fixed gas costs, variable costs, and related charges.  The Purchased Gas Adjustment itself is comprised of three major components: (1) the Gas Charge Adjustment, (2) the Refund Adjustment, and (3) the Actual Cost Adjustment.  The utility is required to file a variety of PGA tariff sheets related to the PGA calculations.[8]

Before a utility is permitted to alter the PGA, the utility must file the proposed tariff changes with the TRA at least thirty days before the effective date.  *See* PGA Rule 1220-4-7-.02(3).  If the TRA does nothing, the revised rates go into effect after expiration of the thirty-day period.  The TRA may instead choose to suspend the proposed changes and set the matter for a hearing.  The PGA Rules recognize that, in some instances, thirty-days' notice as to the cost of gas is not feasible, such as when the Gas Company receives less than thirty days' notice from its supplier of an increase in price.  In such instances, the TRA "may permit the Company to place rates into effect with shorter advance notice, upon good cause shown."  PGA Rule 1220-4-7-.02(3).

At least once a year, the utility must file a non-binding gas purchase plan with the TRA.  As provided under the PGA Rules, the TRA Staff audits the annual report and filing.  *See* PGA Rule 1220-4-7-.05(1).  If the TRA does not order a hearing within ninety days of the filing, the public utility's gas purchasing practices are deemed prudent.  *See* PGA Rule 1220-4-7-.05(2).

---

[6]The Tenn. Comp. R. & Regs. 1220-4-7 and the subsections therein will be cited as "PGA Rule" in this Opinion.

[7]As stated in the regulations, "The[] Purchased Gas Adjustment (PGA) Rules are intended to permit the company to recover, in timely fashion, the total cost of gas purchased for delivery to its customers and to assure that the Company does not over-collect or under-collect Gas Costs from its customers."  PGA Rule 1220-4-7-.02(1).

[8]We need not go into detail about the various PGA tariff sheets required to be filed with the TRA.  Suffice it to say that the PGA tariff sheets are filed with the TRA, and the TRA must approve any changes in these tariff sheets.

**Asset Management Practices**

The monthly charges to the Gas Company's customers are also affected by the Company's "asset management" practices, that is, its practices related to gas purchases. The public utility's asset management practices are the method by which it ensures that it will have sufficient natural gas supply available for the consumers.

The Gas Company outsources certain of its asset management tasks to AGL Resources/AGL Services Company ("AGL Resources"), a natural gas distribution company.[9] AGL Resources personnel, working exclusively for the Gas Company, determine the level of natural gas that the Gas Company will purchase to fill the needs of its customers. Once the gas is purchased, the Gas Company sells or assigns its rights to some of its pipeline capacity assets, *i.e.* purchased gas, to an asset manager for a fee. The asset manager is then responsible for managing the purchased gas supply so as to ensure that the Gas Company's customers have an adequate amount of gas when they need it. If it is determined that some of the pipeline capacity assets that have been purchased will not be needed to meet the needs of the Gas Company's customers, the asset manager can market the excess assets to other jurisdictions.

In this case, the Gas Company entered into an asset management agreement with a company affiliated with the Gas Company, asset manager Sequent Energy Management ("Sequent"). The Gas Company selected Sequent as its asset manager through a competitive Request for Proposal ("RFP") process, as required by the Gas Company's tariff. Under the asset management agreement, Sequent was responsible for marketing and selling the Gas Company's excess assets. The Agreement provides that the profit earned from the non-jurisdictional sales of such excess assets would be shared equally (50/50) between Sequent and the Gas Company. The Gas Company would then, in turn, pass its share of the profit from the asset sales directly to its customers. The Gas Company's affiliate, Sequent, keeps its share of any profits. The asset management agreement between the Gas Company and Sequent required Sequent to pay a minimum annual fee to the Gas Company, regardless of whether any gains were earned from the sale of assets. The costs associated with Sequent's performance of its duties as the Gas Company's asset manager were to be deducted from Sequent's portion of the profits from the asset sales.

Through the Gas Company's asset management practices, it has been able to return some of this profit from the sale of excess assets to consumers. For example, over a thirty-nine month

---

[9]The Gas Company is a subsidiary of AGL Resources. The Gas Company's functions of load forecasting, pipeline transportation capacity, storage service levels, peaking capability requirements, daily supply resource management, system monitoring, and asset manager compliance are all performed by AGL Resources employees, who work exclusively for the Gas Company.

period from 2005 to 2008, Gas Company customers received approximately $7.9 million from the non-jurisdictional sale of its gas supply and capacity assets.

Gas Company customers recover their share of the profits from non-jurisdictional asset sales through the Interruptible Margin Credit Rider ("IMCR"), which is included in the Gas Company's tariff at "Gas Tariff, TRA No. 1, Tenth Revised Sheet No. 48." The IMCR provision included in the tariff is not a component of the PGA Rules; rather, it is a tariff provision unique to the Gas Company. The IMCR provision states that it is "intended to authorize the Company to recover not more than ninety percent (90%) of the gross profit margin losses," and "to authorize the Company to recover not more than fifty percent (50%) of the gross profit margin that results from transactions with non-jurisdictional Customers . . . should such transactions be made by the Company."

The Gas Company is required to file with the TRA an annual report of the negotiated rate gross profit margin losses and the gross profit margin from non-jurisdictional transactions.[10] The IMCR annual report also includes the calculation of the IMCR adjustment factor to be applied to customers' bills. The IMCR factor is a separate billing factor, either a credit or surcharge as applicable. The entire IMCR report, including the accounting for the Gas Company's asset management funds and the application of the IMCR factor to the bills of Gas Company customers, is subject to an annual audit by the TRA Staff.

## ADMINISTRATIVE PROCEEDINGS BELOW
### Rate Case 1 – Docket No. 06-00175

On June 30, 2006, the Gas Company filed a petition with the TRA. Among other things, the petition sought to increase the Gas Company's base rate and implement a new rate design proposal.[11] As required, the Gas Company filed the revised tariff with its petition and requested that the new rate be effective as of January 1, 2007. In the same time period, the Gas Company filed several other tariffs, all containing the effective date of July 31, 2006. To consider these matters, the TRA convened a contested case proceeding under Docket No. 06-00175. In this Opinion, Docket No. 06-00175 is referred to as "Rate Case 1."

In July 2006, on behalf of local consumers, the Petitioner/Appellant Consumer Advocate and Protection Division of the Office of the Attorney General of Tennessee ("Consumer

---

[10]This annual filing is separate and distinct from the annual filing required by PGA Rule 1220-4-7-.03(2).

[11]The Gas Company requested that the TRA approve the implementation of a comprehensive rate design proposal, which included an Energy Conservation Plan and a Conservation and Usage Adjustment.

Advocate")[12] and Respondent/Appellee Chattanooga Regional Manufacturer's Association (individually "the Manufacturer's Association") (collectively "Consumer Groups"),[13] on behalf of local consumers, filed petitions to intervene in Rate Case 1. The intervenor petitions claimed that the increase in revenue and other changes sought by the Gas Company were not fair, just, or reasonable, and were not in the best interest of the consumer. On July 27, 2006, the TRA entered an order suspending the tariffs, granting the Consumer Groups' motions to intervene, and establishing a schedule for the proceedings. In addition, the TRA bifurcated the proceedings into two phases: revenue requirement (Phase I) and rate design (Phase II).

During the proceedings, the Consumer Groups raised concerns related to the asset management arrangement between the Gas Company and its affiliate, Sequent. The Consumer Advocate wanted to examine Sequent's gas purchase practices and had concerns about whether Sequent and the Gas Company were purchasing the correct amount of gas under their gas supply plan. Essentially, the Consumer Groups alleged that the Gas Company was oversubscribing its capacity assets, that is, purposefully buying too much gas to help its affiliate Sequent make profits on the sale of the excess, to the detriment of consumers. Those concerns did not fit neatly into the characterization of either Phase I or Phase II, but the TRA made a decision to move the issues to Phase II of the proceedings.

On November 20, 2006, the Gas Company and the Consumer Groups filed with the TRA a "Proposed Settlement Agreement" to resolve the Phase I issues. At a regularly held TRA Conference held on December 5, 2006, the Settlement Agreement was unanimously approved by the TRA. This concluded Phase I of the TRA proceedings.

On May 8, 2007, the Gas Company filed a request with TRA to close Phase II of the proceedings, because the issues that the parties proposed to address in Phase II — energy conservation, asset management, and capacity release — were being addressed in an existing docket, Docket No. 06-00298.[14] To facilitate its request to close Phase II, the Gas Company

---

[12]The Consumer Advocate is a division of the Office of the Attorney General & Reporter which represents the interests of Tennessee consumers of public utilities. *See* Tenn. Code Ann. §§ 65-4-118(c), 65-5-110(b) (2004).

[13]The Manufacturer's Association describes itself as a one-hundred-year-old trade association representing over 250 manufacturers and other businesses supporting, servicing, and associated with the manufacturing sector. Many are customers of the Gas Company.

[14]Some evidence in the record suggests that on February 23, 2007, the Phase II proceedings were suspended pending a decision that was already before the TRA in a rate case involving Atmos Energy, Docket No. 05-
(continued...)

stated that it would withdraw the conservation initiatives it had proposed as part of its original TRA petition. The Consumer Groups both objected to the closing of Phase II and expressed concern regarding their opportunity to be heard on the asset management and capacity release issues. Ultimately, however, the Consumer Groups agreed that Docket No. 06-00298 would provide an acceptable forum for litigation of those issues.

Accordingly, at a regularly scheduled Authority Conference on July 9, 2007, the TRA voted to approve the Gas Company's request to close Phase II, and the case was closed by TRA order entered on December 17, 2007. Because the audit performed in Docket No. 06-00298 had been completed by the time the TRA order was entered, and the introduction of new issues into that case would likely have created unnecessary delay in the final resolution of the audit, the TRA decided to form a separate docket to consider the asset management and capacity release issues raised by the Consumer Groups.[15] This separate docket is discussed below.

### The Asset Management Docket - Docket No. 07-00224

Accordingly, the TRA opened a new contested case under Docket No. 07-00224 in order to conduct an "evaluation of [the Gas Company's] gas purchases and related sharing incentives." The Consumer Groups were allowed to intervene in this docket and to participate in the proceedings.[16] On January 15, 2008, the TRA issued an order convening a contested case. This new docket is referred to herein as "the Asset Management Docket."

Because the asset management issues were removed from Rate Case 1, and the litigation expenses involved in the new docket would not be factored into the setting of rates in Rate

---

[14](...continued)
00258, regarding the issue of what was the appropriate forum for the Consumer Advocate to litigate gas supply costs and asset management practices. The Gas Company filed this motion to close Phase II in Rate Case 1 because, based on the suspension of the proceedings, there was no activity in the docket.

[15]The record indicates that the parties agreed to the transfer of the asset management issues into a separate docket to avoid complications that would arise if a final order were not entered in the existing docket within six months after the filing of the petition. *See* Tenn. Code Ann. § 65-5-103(a), (b).

[16]The Manufacturer's Association indicated that it intended to intervene in this docket, but it apparently never filed a petition to intervene. Nevertheless, Counsel for the Manufacturer's Association regularly participated in the proceedings.

Case 1,[17] the Gas Company sought to recover those litigation expenses in the context of the Asset Management Docket. To this end, on February 28, 2008, at the beginning of the proceedings in the Asset Management Docket, the Gas Company filed a motion to accumulate and defer its litigation costs for financial accounting and regulatory purposes so that, in the end, it would be able to recover those costs from consumers in the future if the TRA determined that the litigation expenses were recoverable. Additionally, the Gas Company sought "as an ultimate issue in this proceeding to recover the costs incurred in this contested case proceeding from the ratepayers through the Purchased Gas Adjustment Rule ('PGA'), Chapter 1220-4-7." The Gas Company reasoned: "As all claims to be litigated in this docket relate to gas and capacity related costs includible in [the Gas Company's] PGA, it is proper for [the Gas Company] to recover the costs associated with the litigation in this contested case proceeding through the PGA."

The TRA granted the Gas Company's request to accumulate and defer the litigation costs, but clarified that "[t]his determination . . . does not address the issue of whether [the Gas Company] may recover these costs in the future from ratepayers," and it expressly reserved that issue for a later date. On March 17, 2008, the TRA entered an order setting the issues to be decided in the Asset Management Docket. The order expressly included the issue of whether the Gas Company would be able to recover from ratepayers litigation costs incurred as a result of its participation in the Asset Management Docket.[18]

By all accounts, the Asset Management Docket was a "complex, lengthy, and protracted" adversarial proceeding that lasted some two years. It is not necessary for us to recount the details of those proceedings. However, we note that the Asset Management Docket proceedings included a myriad of disputes; the parties participated in four rounds of discovery, and in the course of discovery, the Gas Company was required to respond to over two hundred requests for production propounded by the Consumer Groups. The extensive discovery also resulted in numerous briefings, motions to compel, and status conferences. At one point during the proceedings, the Consumer Advocate compared itself to a prosecutor in a criminal proceeding and claimed that the Gas Company was engaging in defense tactics similar to those of an accused criminal. The Gas Company, on the other hand, described the

---

[17]The Gas Company recovered $300,000 in litigation expenses in Rate Case Expenses incurred in in Rate Case 1 through the setting of the base rates.

[18]The list of issues to be addressed in the Asset Management Docket was the subject of some debate. The Consumer Advocate submitted a revised list of the issues it proposed for resolution in the Asset Management Docket, and the Gas Company filed a response and a motion to dismiss the claims asserted against it by the Consumer Groups. The TRA denied the Gas Company's motion to dismiss and set out its own list of issues to be decided in that docket.

Consumer Advocate's discovery requests and overall tactics by using phrases such as "abusive and expensive fishing expedition," or "witch hunt," or "wild goose chase."

On June 22, 2009, prior to the final hearing in the Asset Management case, the Gas Company filed a motion for clarification relating to issues of accumulated and deferred litigation costs. The motion asked for instructions from the TRA on the proper time at which the Gas Company should provide proof concerning the accumulated and deferred legal expenses it incurred in the proceedings, considering the fact that the Gas Company's litigation expenses would extend beyond the final hearing. In the Consumer Advocate's response, it agreed with the Gas Company that the litigation costs may extend beyond the close of the final hearing, and it took the position that the hearing on the merits in the Asset Management case was not the appropriate time to address the issue of the Gas Company's litigation expenses. The Consumer Advocate's response also stated: "In agreeing to take up this issue after the hearing, the Consumer Advocate does not waive its right to contest any aspect of the cost issue, including, but not limited, to amount." On June 29, 2009, during a pre-hearing conference, the TRA Hearing Officer agreed with the parties and directed the Gas Company to file the proof on its litigation costs at the close of the Asset Management case proceeding. The hearing on the merits was scheduled for July 13, 2009.

On July 8, 2009, prior to the scheduled hearing, the parties jointly filed a Proposed Settlement Agreement, resolving all issues in the Asset Management Docket. It included an agreement to permit the Gas Company to recover the legal expenses incurred in the Asset Management docket. The Proposed Settlement Agreement further provided that the Gas Company's litigation expenses "shall be recorded in the Deferred Gas Cost Account and shall be recovered based on the schedule below through the procedures set forth in the PGA Rules, subject to submission of such costs to the Authority, the Authority's determination that such costs were prudently incurred, and subject to a maximum cap in the amount of $500,000."

On July 13, 2009, prior to convening the scheduled hearing on the merits, the TRA considered the parties' Proposed Settlement Agreement. The TRA voted unanimously to deny the Proposed Settlement Agreement, finding that it did not set forth a useful process that could be implemented by the TRA for continuing or future evaluation of the subject matters it addressed. The TRA also found that the proposed settlement was not in the best interest of consumers, the parties, or the TRA. After rejecting the Proposed Settlement Agreement, the TRA commenced the hearing on the merits, and the parties put on their proof.

At the conclusion of the proof, the TRA ordered the parties to file written post-hearing briefs within two weeks of their receipt of the transcript of the Asset Management case hearing. In accordance with the TRA's previous ruling, the proof submitted pertained only to the Gas

Company's asset management and capacity release practices; no proof was submitted regarding the litigation expenses incurred by the Gas Company in the Asset Management Docket.

On August 24, 2009, at a regularly scheduled Authority Conference, the TRA found that the Gas Company had subscribed to an appropriate level of mix of storage, peaking, and transportation capacity. It determined that, while the Gas Company's asset mix appeared reasonable at that time, anticipated changes in customer mix, weather, and usage patterns necessitated future periodic review by the TRA of the Gas Company's capacity planning. The TRA also ordered the Gas Company to submit future management RFPs to the TRA for approval prior to placing them out for bid. The TRA concluded by ordering that "a triennial review of capacity planning shall occur beginning in 2012 with the selection of an independent consultant." The TRA allowed the parties a fourteen-day period within which to comment on the TRA's ruling. The Gas Company and the Consumer Advocate both filed comments.

During its regularly scheduled Authority Conference on September 21, 2009, the TRA panel considered the comments filed by the parties. It voted unanimously to review the Gas Company's capacity planning in 2013, rather than 2012, with any future review to be determined upon the conclusion of the 2013 review. The TRA further determined that the cost of the 2013 review would be borne by the Gas Company, which would then be permitted to recover the cost through the Actual Cost Adjustment ("ACA") account of the PGA Rules.

On October 6, 2009, the Gas Company filed with the TRA detailed proof, including affidavits, of the litigation expenses it incurred in the Asset Management Docket. The Gas Company contended that, over the course of the two plus years of litigation in the Asset Management Docket, it incurred litigation expenses totaling approximately $744,743.81.[19] On October 23, 2009, the TRA Hearing Officer entered an order setting the issues and time for filing briefs related to the Gas Company's recovery of its litigation costs. As the Hearing Officer had been informed that the parties had reached a partial agreement on the issue of the Gas Company's recovery of its litigation expense, the Hearing Officer also ordered the parties to file their agreement and provide briefs on: (a) the percentage of the total legal expenses that the Gas Company should be permitted to recover from ratepayers, and (b) the appropriate amortization period for the recovery of approved litigation costs.

---

[19]This figure included the cost of outside attorney fees incurred by two law firms that represented the Gas Company. It did not include the retention of outside experts, because the Gas Company relied on the expertise of its own AGL Resources employees during discovery and at the hearing. It also did not include the expenses incurred in the time and travel costs for those employees.

On October 28, 2009, the Consumer Advocate filed a Stipulation with the TRA, stipulating that it did not contest the accuracy of the total billing amounts for the Gas Company's litigation expenses, that it did not contest that the work had been performed, and that it "agreed that the amount of costs allowed to be recovered shall be recovered through the PGA [Rules]." The parties did not agree about the portion, if any, of those costs the Gas Company should be allowed to recover from consumers, nor did they agree about the amortization period for the recovery of any such costs.

Also on October 28, 2009, the Gas Company and the Consumer Advocate filed briefs with the TRA Panel on the litigation expense issue. The Gas Company asserted that its legal expenses were incurred prudently in defending Gas Company actions that were ultimately found to have been performed in compliance with TRA-approved procedures, and that the expenses were appropriate and reasonable. The Consumer Advocate conceded that the TRA had the authority to award litigation expenses to the Gas Company.[20] The Consumer Advocate argued, however, that any such award should be no more than one-half of the Gas Company's expenses in the Asset Management Docket. The Consumer Advocate contended that, if the TRA allowed the Gas Company to recover all of the litigation expenses claimed, "a dangerous precedent would be set for future non-ratemaking dockets." The Consumer Advocate noted that the Gas Company offered no statutory authority for the recovery of such expenses outside of a rate case, but acknowledged that this matter presented a unique situation:

> [G]iven the unique history of this matter, including extensive discovery filed by the Consumer Advocate in an attempt to gather information in this complex Docket of first impression, the Consumer Advocate understands that some recovery of costs may be appropriate under the circumstances.
>
> ***
>
> The Consumer Advocate recognizes that this has been a protracted case with extensive discovery and involving complex issues, many of first impression, therefore some award of costs could be justified.

The Consumer Advocate argued that, regardless, any final decision should take into account that the TRA ultimately granted some of the relief requested by the Consumer Advocate by ordering a triennial review of the Gas Company's asset management program. The

---

[20]At oral argument before the TRA, the Consumer Advocate clarified its position on the subject: "[T]he Consumer Advocate maintains it's in the discretion of the TRA to completely deny Chattanooga Gas' request for cost recovery. Meaning that certainly you can order [that it] recover all their costs, some of their costs, or none of their costs."

Consumer Advocate proposed that any recovery of the Gas Company's litigation fees should be spread out over a period of three years to reduce the burden on consumers.

On November 9, 2009, the parties presented oral argument on the litigation expense recovery issue before the regularly scheduled TRA Authority Conference. At the hearing, the Consumer Advocate and the Gas Company agreed that any recovery should be through the PGA mechanism. The TRA took the issue under advisement.

## Rate Case 2 – Docket No. 09-00183

Around that time, on November 16, 2009, the Gas Company filed another petition with the TRA requesting a rate increase and a modification of its rate design.[21] This case was assigned Docket No. 09-00183. Although the TRA panel members are apparently assigned randomly to a given docket, it so happened that the TRA panel assigned to the docket for this petition was comprised of the same three Directors who had been assigned to the Asset Management Docket.[22]

At a special TRA Conference on this Gas Company petition, held on November 30, 2009, the TRA panel voted to convene a contested case proceeding, to suspend the tariff for ninety days, and to appoint a Hearing Officer for the purpose of hearing preliminary matters and preparing the matter for a contested hearing before the panel. The Consumer Groups were permitted to intervene in this docket as well for the purpose of opposing the proposed rate increase. This docket is referred to herein as "Rate Case 2."

On December 29, 2009, before the TRA addressed the litigation cost recovery issue pending in the Asset Management Docket, the Manufacturer's Association filed a motion in Rate Case 2 "to Combine the Request of Chattanooga Gas for Reimbursement of Legal Fees in Docket 07-00224 [the Asset Management Docket] with the Request of Chattanooga Gas for a General Rate Increase in Docket No. 09-00183 [Rate Case 2]." The Manufacturer's Association argued that the Gas Company's request for costs should be transferred to Rate Case 2, "because (1) the request is for a specific expense, (2) [the Gas Company's] ratepayers need to have public notice of this increase, as well as, the opportunity to comment, and (3) the TRA does not have the statutory authority to award legal fees outside of a rate case proceeding."

_____

[21] In that filing, the Gas Company also proposed the implementation of an energy conservation program called EnergySMART and the adoption of an Alignment and Usage Adjustment revenue decoupling mechanism.

[22] The three Directors were TRA Chair Sara Kyle, Director Eddie Roberson, and Director Mary W. Freeman.

The Consumer Advocate filed a response to the motion to combine. The Consumer Advocate agreed that legal costs could never be awarded by the TRA in a non-rate case, regardless of the docket in which the costs were incurred. The Consumer Advocate acknowledged that this position was contrary to its earlier concession that the TRA had the discretion to award such expenses. The Consumer Advocate explained that, after reviewing Tennessee authority on the subject, it came to the position that the TRA could not award litigation costs to the Gas Company in this non-rate case. In response, the Gas Company argued that all prudent litigation expenses were recoverable, whether incurred in a rate case or otherwise, and that the Gas Company's legal fees should be categorized as "gas-related costs" and collected from ratepayers under the PGA Rules. Those rules permit amounts paid to a consultant by a local distribution company to be recorded in the Deferred Gas Cost Account and recovered through a PGA filing. *See* PGA Rule 1220-4-7-.05(1)(a)(3).

On January 25, 2010, the parties presented oral argument before the TRA Hearing Officer on the Manufacturer's Association's motion to combine. On February 11, 2010, the Hearing Officer granted the motion and transferred the proceedings related to the Gas Company's request to recover litigation expenses from the Asset Management Docket to Rate Case 2. The Hearing Officer agreed with the Manufacturer's Association and the Consumer Advocate that the prudency of the costs incurred should be considered within a rate case and found that, because Rate Case 2 was ongoing, it was both practical and efficient to combine the Gas Company's request for litigation expenses with the issues in that docket. The Hearing Officer rejected the Gas Company's position and determined that the legal fees requested in the Asset Management Docket were not "gas-related costs" and could not be collected pursuant to the PGA Rules. Rather, he found that utility legal fees and regulatory expenses were ordinarily evaluated in the context of a rate case, and if considered valid and prudent, they could be included in a portion of the overall cost of service for recovery through an increase in the base rate.

Discovery in Rate Case 2 ensued. The Hearing Officer set the matter for a hearing on the merits before the TRA panel in Nashville.

In April 2010, a three-day hearing on the merits was conducted before the TRA panel in Rate Case 2.[23] The panel heard testimony from several witnesses on behalf of both the Gas Company and the Consumer Groups.

Regarding the issue of the Asset Management Docket litigation expenses, the Gas Company submitted the testimony of the director of regulatory affairs of AGL Resources, Archie

---

[23]The hearing was conducted on April 12, 13, and 26, 2010.

Hickerson ("Mr. Hickerson").[24] Mr. Hickerson testified that litigation expenses are normal operating costs of the utility and are routinely included in the regulatory expenses that are incorporated into the cost of service when rates are set. He also asserted that "any cost that the [Gas Company] incurs in the normal [course] of business, they can ask to and recover those costs, and the TRA does have the authority to award the recovery of those costs."

Mr. Hickerson indicated that, although the Asset Management Docket was not a traditional rate case, the litigation expenses incurred by the Gas Company in that docket were recoverable pursuant to the NARUC[25] Uniform System of Accounts and the FERC[26] Uniform System of Accounts, adopted by the TRA,[27] which provide that "Regulatory Commission Expenses" include "all expenses . . . incurred by the utility in connection with formal cases before regulatory commissions or other regulatory bodies." The NARUC and FERC systems also provide that such Regulatory Commission Expenses "shall be charged to account 186, Miscellaneous Deferred Debits, and amortized by charges to this account." Specifically, the recoverable expense items included "expense of counsel, solicitors, attorneys, . . . or defense against petitions or complaints presented to regulatory bodies . . . ." Mr. Hickerson acknowledged, however, that he was not aware of any prior TRA ruling in which the TRA had awarded litigation costs in a non-rate case.

Mr. Hickerson testified as to the amount of litigation expenses claimed by the Gas Company ($744,743.81), and stated that the Gas Company had filed proper verification for the litigation expenses with the TRA. He also said that the Gas Company proposed to recover these litigation fees via the PGA/ACA mechanism through a temporary rider on the Company's tariff over a period of three years.

The Consumer Advocate submitted the testimony of Terry Buckner ("Mr. Buckner"), who is a Financial Regulatory Analyst in the Office of the Attorney General. Mr. Buckner testified that the issues addressed in the Asset Management Docket, involving the cost of gas and asset management, were not those traditionally addressed in rate cases. He asserted that the TRA does not have authority under Tennessee law to grant a request for recovery of legal fees in a non-rate case, regardless of the docket number in which the decision is made. Mr.

---

[24]Mr. Hickerson testified that he was responsible for the Gas Company's compliance filings with the TRA and developing and maintaining the Gas Company's tariffs.

[25]National Association of Regulatory Utility Commissioners.

[26]Federal Energy Regulatory Commission.

[27]See Tenn. Comp. R. & Regs. 1220-1-4-.11(1)(c), which provides that the NARUC system of accounting is to be followed by gas companies in making their periodic reports to the TRA.

Buckner indicated that he relied on the case of ***Kingsport Power Company v. Tennessee Public Service Commission***, No. 84-281-II, 1985 WL 1105936 (Tenn. Ct. App. Feb. 5, 1985), in reaching this conclusion. Mr. Buckner also addressed the reasonableness of the attorney fees claimed by the Gas Company, opining that the litigation expense sought by the Gas Company was excessive. He pointed out that there had been no evidentiary hearing regarding whether the Gas Company acted prudently in incurring those fees.

In May 2010, the parties submitted post-hearing briefs. On May 24, 2010, the TRA Panel convened at a regularly scheduled Authority Conference to consider the post-hearing briefs. TRA Director Eddie Roberson drafted a recommendation to the panel and submitted it to the panel in the form of a motion. He recommended that the Gas Company be permitted to recover all of the Asset Management Docket litigation expenses requested:

> This has been a most contentious issue between the company and the Consumer Advocate. . . . I do believe the costs are recoverable since they derived from [a rate case]. . . . It was not the company's or the stockholders' decision whether to spin off the asset manager question into a separate docket. It was the TRA's. The process of [the Asset Management Docket] should cause all of us to consider the cost of litigation, which in the final analysis is a cost to ratepayers, when pursuing regulatory issues. In my mind, the question is not whether the legal fees of the company are recoverable but how they will be recovered.

At the hearing, the other two panel members, TRA Chair Sara Kyle and Director Mary Freeman, agreed with the opinion of Director Roberson.

On November 8, 2010, the TRA issued a lengthy order that resolved the issues related to the Gas Company's petition in Rate Case 2. The TRA order also granted the Gas Company's request to recover the full amount of litigation expenses it incurred in the Asset Management Docket. Furthermore, it permitted the Gas Company to recover those funds from consumers by way of the asset management fund. The TRA explained:

> The panel found that [the Gas Company] was required by the Authority to participate in [the Asset Management Docket] and did incur the legal expense in a complex, lengthy and protracted proceeding. Additionally, the panel found that these costs were incurred in litigating the issues stemming from [the Gas Company's] prior rate case docket, [Rate Case 1]. Upon questioning by Director Roberson, Mr. Buckner acknowledged that these legal expenses would have been an allowable rate case expense in [Rate Case 1] if the asset management issue had been litigated within the [Rate Case 1] docket.

-17-

Therefore, the panel determined that [the Gas Company] should be allowed full recovery of the legal costs incurred in [the Asset Management Docket]. The panel determined that the most equitable method for the Company to recover these costs would be from asset management funds. Allowing recovery of legal expenses from asset management funds is an appropriate accounting treatment for the non-recurring legal expenses and also provides the Company a more timely recovery of legal expenses it has already paid. The panel determined the recovery of legal expenses should come from the consumers' share of earnings from the asset management fund, rather than through a recurring charge on their monthly bill. Thereafter, the panel voted unanimously that recovery of legal expenses should be from asset management funds.

Thus, the TRA ordered: "The full amount of legal costs from [the Asset Management Docket] shall be recovered and such recovery shall be from asset management funds."

The order also reflected the TRA's decision to allow the Gas Company to recover other expenses from asset management funds. Specifically, the TRA ordered that "[t]he Programmable Thermostat measure and funding of $150,000 for Education and Outreach Programs shall be funded through revenues generated by [the Gas Company's] asset manager and be collected through [the Gas Company's] IMCR tariff." The TRA also ordered the Gas Company to pay $20,000 from asset management funds each year for three years for consumer-oriented research.[28]

The Consumer Advocate now appeals the TRA's decision to permit the Gas Company to recover its litigation expenses incurred in the Asset Management Docket from asset management funds. Although the Manufacturer's Association was aligned with the Consumer Advocate in the proceedings before the TRA, it has changed its alignment on appeal and has filed an appellate brief in support of the Gas Company and the TRA. On appeal, the Manufacturer's Association takes the position that the TRA properly considered the Gas Company's request for Asset Management Docket litigation expenses within the context of a rate case, after proper notice and a hearing, and that the TRA had the authority to grant the Gas Company's request. Thus, the Gas Company, the Manufacturer's

---

[28]On October 10, 2010, in accordance with the TRA's May 24, 2010 ruling, AGL Resources, on behalf of the Gas Company, filed with the TRA a revised IMCR that included this provision: "The Company shall also recover through this Rider other costs authorized by the Authority." This sentence was added to the IMCR to allow the costs specifically approved by the TRA to be included in the IMCR filing, without having to list each type of cost separately.

Association, and the TRA (collectively "Appellees") have all submitted appellate briefs in support of the TRA's decision.

**ISSUES ON APPEAL AND STANDARD OF REVIEW**

1. Whether the TRA exceeded its authority when it awarded litigation costs, including attorney fees, for the first time in a case where rates were not being set?

2. Whether a docket to evaluate the Gas Company's asset management practices, in which no rates were set, was a rate case?

3. Whether the TRA exceeded its authority when it ordered that litigation costs, including attorney fees, should be recovered through a rule governing the cost of gas that does not permit such recovery?

4. Whether the award of litigation costs, including attorney fees, for the asset management docket on the basis that they "stemmed" from a rate case constituted retroactive ratemaking, which is prohibited under Tennessee Law?

One who is aggrieved by a final decision of the TRA must file an appeal with the Middle Division of this Court. Tenn. Code Ann. § 4-5-322(b)(1)(B)(iii) (2011). The standard for appellate review of a decision of the TRA is set forth in Tennessee Code Annotated § 4-5-322(h):

(h) The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority of the agency;

(3) Made upon unlawful procedure;

(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

(5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.

(B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

Tenn. Code Ann. § 4-5-322(h). Thus, the review by this Court is for the "very limited purpose of determining whether the [TRA] has acted arbitrarily, or in excess of its jurisdiction, or otherwise unlawfully." *CF Indus. v. Tenn. Pub. Serv. Comm'n*, 599 S.W.2d 536, 540 (Tenn. 1980) (quoting *City of Whitwell v. Fowler*, 343 S.W.2d 897, 899 (Tenn. 1961)).

All of the issues raised by the Consumer Advocate in this appeal involve the question of whether the TRA exceeded its authority or committed other legal error.[29] Such issues are reviewed *de novo* on the record, affording no presumption of correctness to the trial court's TRA's decisions. *See Tenn. Am. Water Co.*, 2011 WL 334678, at *15 (citing *Tenn. Envt'l Council, Inc. v. Tenn. Water Quality Control Bd.*, 254 S.W.3d 396, 402 (Tenn. Ct. App. 2007)). Issues involving statutory interpretation are also issues of law, which we review *de novo*. *Kiser v. Wolfe*, 353 S.W.3d 741, 745 (Tenn. 2011).

In interpreting the relevant statutes and regulations, we are guided by familiar rules of statutory construction:

> The role of this Court in construing statutes is to ascertain and give effect to legislative intent. *Cronin v. Howe*, 906 S.W.2d 910, 912 (Tenn. 1995). Whenever possible, legislative intent is to be ascertained from the natural and ordinary meaning of the language used, without forced or subtle construction that would limit or extend the meaning of the language. *Id.* We must avoid strained constructions which would render portions of the statute inoperative or void. *State v. Turner*, 913 S.W.2d 158, 160 (Tenn. 1995). Instead, we must apply a reasonable construction in light of the purposes and objectives of the statutory provision. *Id.*

*Consumer Advocate Div. v. Greer*, 967 S.W.2d 759, 761 (Tenn. 1998) (hereinafter "*Greer*"). Furthermore, "a state agency's interpretation of a statute that the agency is charged to enforce

---

[29]The Consumer Advocate does not challenge the amount of litigation expenses incurred by the Gas Company or the prudency or reasonableness the amount incurred.

-20-

is entitled to great weight in determining legislative intent." *Id.* (citing *Nashville Mobilphone Co., Inc. v. Atkins*, 536 S.W.2d 335, 340 (Tenn. 1976)).

**ANALYSIS**

**Authority of the TRA**

Our analysis must be rooted in an understanding of the TRA's authority. The TRA is a regulatory agency and, consequently, it may exercise only the authority that is given to it expressly by statute or which arises by necessary implication from an express grant of authority. *BellSouth Adver. & Pub'g Corp. v. Tenn. Reg. Auth.*, 79 S.W.3d 506, 512 (Tenn. 2002); *Tenn. Public Serv. Comm'n v. So. Ry. Co.*, 554 S.W.2d 612, 613 (Tenn. 1977). The Tennessee legislature's grant of authority to the TRA is broad indeed. By statute, the General Assembly has explicitly granted the TRA "practically plenary authority over the utilities within its jurisdiction." *BellSouth Adver. & Publ'g Corp.*, 79 S.W.3d at 312 (quoting *Tenn. Cable Tele. Ass'n v. Tenn. Pub. Serv. Comm'n*, 844 S.W.2d 151, 159 (Tenn.Ct. App.1992)). The primary statutory grant of authority is found in Tennessee Code Annotated § 65-4-104, which gives the TRA "general supervisory and regulatory power, jurisdiction and control over all public utilities, and also over their property, property rights, facilities, and franchises, so far as may be necessary for the purpose of carrying out the provisions of this chapter." Tenn. Code Ann. § 65-4-104 (2004). Moreover, Tennessee caselaw, in adherence to statutory mandates, directs the courts to give statutes related to the authority of the TRA "a liberal construction;" it cautions that "any doubts as to the existence or extent of a power conferred on the [TRA] . . . shall be resolved in favor of the existence of the power, to the end that the [TRA] may effectively govern and control the public utilities placed under its jurisdiction . . . ." *Greer*, 967 S.W.2d at 761-62 (quoting Tenn. Code Ann. § 65-4-106 (Supp. 1997)).

Specific to the issues in this case, the TRA has been given broad power "to fix just and reasonable individual rates, joint rates, tolls, fares, charges or schedules thereof, as well as commutation, mileage, and other special rates . . . ." Tenn. Code Ann. § 65-5-101. The authority to fix rates has been delegated totally to the TRA:

> The General Assembly intended to leave rate-making to the Commission's technical competence and specialized knowledge. *CF Indus. v. Tennessee Pub. Serv. Comm'n*, 599 S.W.2d 536, 540 (Tenn. 1980). The only limit it placed on the Commission was that the rates must be "just and reasonable." Tenn. Code Ann. § 65-5-201. The breadth of the Commission's authority has prompted the Tennessee Supreme Court to characterize rate-making as essentially "a value judgment made by the Commission in the exercise of its

-21-

sound regulatory judgment and discretion." *CF Indus. v. Tennessee Pub. Serv. Comm'n*, 599 S.W.2d at 542.

*Tenn. Cable Television Ass'n v. Tenn. Pub. Serv. Comm'n*, 844 S.W.2d 151, 159 (Tenn. Ct. App. 1992). "The polestar of public utility rate establishment and regulation is the 'just and reasonable' requirement . . . . There is no statutory nor decisional law that specifies any particular approach that must be followed by the [TRA]." *CF Indus.*, 599 S.W.2d at 542. The TRA is expected to use its own experience, technical competence, and specialized knowledge in fixing just and reasonable rates, so the TRA's actions in setting rates are not constrained by the record in a given case. *Id.* "Thus, focusing upon the issues, the [TRA] decides that which is just and reasonable. This is the litmus test — nothing more, nothing less." *Id.* at 543.

In order for the TRA to exercise its plenary authority to govern public utilities, the General Assembly has authorized the TRA to "adopt rules governing the procedures prescribed or authorized," including "rules of practice before the authority, together with forms and instructions," and "rules implementing, interpreting or making specific the various laws which [the TRA] enforces or administers." *Greer*, 967 S.W.2d at 762 (quoting Tenn. Code Ann. § 65-2-102(1) & (2) (1997 Supp.)). Pursuant to this express statutory authority, the TRA adopted the PGA Rules, described above, related to the cost of gas. "Generally, rules and regulations promulgated pursuant to statutory directive and not inconsistent with such statutes have the force of law." *Kogan v. Tenn. Bd. of Dentistry*, No. M2003-00291-COA-R3-CV, 2003 WL 23093863, at *5 (Tenn. Ct. App. Dec. 30, 2003) (citing *Houck v. Minton*, 212 S.W.2d 891, 895 (Tenn. 1948)).

### Authority to Permit the Recovery of Litigation Expenses

In this appeal, the Consumer Advocate argues that the TRA exceeded its authority when it awarded litigation expenses to the Gas Company. The Consumer Advocate contends that: (1) the Asset Management Docket was not a "rate case" and, therefore, the rationale that litigation costs can be awarded in a "rate case" is inapplicable; (2) the award of litigation expenses in that docket was not made appropriate either because it arose in the context of a rate case or because it was combined with another rate case; (3) awarding litigation expenses to a utility in a non-rate case is not authorized by statute or regulation; (4) awarding litigation expenses to the utility in a non-rate contested case hearing violates the American Rule; and (5) the award of litigation expenses in this case constituted improper retroactive ratemaking. We address these issues in turn.

### The Asset Management Docket – A Rate Case?

To establish the premise for its main argument, the Consumer Advocate first takes the position that the Asset Management Docket was not a "rate case." In making this argument, the Consumer Advocate concedes that the TRA may permit the Gas Company to recover so-called Rate Case Expenses as part of the TRA's implied powers arising out of the legislature's express grant of authority to the TRA to "fix just and reasonable" rates.[30] This rationale, the Consumer Advocate contends, does not apply here because no rates were set in the Asset Management Docket. The Consumer Advocate claims that the term "rates" has a very precise meaning when used in a regulatory context, and that the TRA's power to fix rates extends only to the base rate charged for the distribution of gas to the customer, as established in a rate case. Because the Asset Management Docket was not a rate case, the Consumer Advocate insists, the TRA was without authority to award litigation expenses to the Gas Company in that docket.

In response, Appellees claim that we need not decide whether the TRA has authority to award litigation expenses in a proceeding that is not a "rate case," because the Asset Management Docket was, in fact, a rate case.[31] They argue that the term "rate" is much broader than suggested by the Consumer Advocate, and that it includes base rates, charges, surcharges, gas costs, fees, and *any other mechanism* that the TRA devises for the recovery of a utility's costs from its customers. In fact, the PGA Rules refer to "demand rates" with respect to gas costs, and to the filing of a "rate change" under the PGA Rules. *See* Tenn. Comp. R. & Regs. 1220-4-7-.02(4); 1220-4-7-.03(1)(a)3(i); 1220-4-7-.03(1)(a)5(iv). The term "rates," Appellees argue, can also refer to special tariff rates, which have never been set in the context of rate cases, and the term may also include charges and fees that are in addition to the rates set in a rate case proceeding. Thus, the Appellees argue, because the power of the TRA to "fix just and reasonable" rates extends beyond the setting of base rates, and the resolution of the Asset Management Docket affected the ultimate rates charged to the consumer, the Asset Management Docket should be considered a "rate case."

We agree with Appellees that the TRA's power to "fix just and reasonable" rates extends beyond setting base rates in a rate case. The statutes make it clear that the TRA has very broad "general supervisory and regulatory power, jurisdiction and control over all public

---

[30]There is no statute or regulation that explicitly permits the TRA to include litigation expenses as an operating expense of the utility in a rate case. Rather, the practice of allowing Rate Case Expenses to be recovered by the utility has become the accepted "policy and custom" of the TRA. ***See Tenn. Am. Water Co.***, 2011 WL 334678, at *26.

[31]This assertion is directly contrary to the Gas Company's argument before the TRA, in which it asserted that "[t]his clearly is not a rate case."

utilities," and it presides over all types of regulatory matters. ***See*** Tenn. Code Ann. § 65-4-104 (2004). However, from our review of the record, we must conclude that the Asset Management Docket cannot be characterized as a "rate case" as that term has come to be understood in the vernacular of utility regulation. It appears that a proceeding before the TRA is called a "rate case" only if it is one in which base rates are being set, *i.e.*, where the TRA fixes a base rate that balances the interest of the utility with the public interest and assures that the rate charged is just and reasonable. In the Asset Management Docket, the TRA evaluated the Gas Company's asset management practices to ensure that consumers were not being exploited; rates were neither proposed nor set.[32] Therefore, we cannot accept Appellees' contention that the Asset Management Docket can be characterized as a "rate case" as that term has been understood and used in the context of utility regulation.

Furthermore, we are not persuaded by Appellees' argument that the TRA's award of litigation expenses was authorized because the Asset Management Docket "stemmed" from a rate case. The asset management issues were raised by the Consumer Advocate in Rate Case 1, and could have been decided in that docket. However, they were not decided in that docket. It is undisputed that the estimated litigation expenses incorporated into the rate that was set in Rate Case 1 did not include fees for the litigation of the asset management issues.[33] Instead, the asset management issues were transferred and resolved in their own separate docket, apart from the setting of base rates.[34]

Likewise, we decline to accept Appellees' argument that the award of litigation expenses by the TRA was authorized because the litigation expenses were awarded "in the context of a rate case." After the merits of the asset management issues raised by the Consumer Advocate were decided, the question of the Gas Company's litigation expenses was transferred to Rate Case 2, in part so that the litigation expenses could be decided "in the context of a rate case."[35] This transfer, however, did not transform the Asset Management Docket into a "rate

---

[32]In testifying to the TRA, even the Gas Company's expert agreed that the Asset Management Docket "was not a traditional rate proceeding by any means, and [the Gas Company] could not reasonably estimate the cost to be incurred."

[33]Had the issues been decided in those proceedings, the Gas Company presumably would have increased the amount of estimated Rate Case Expenses for the docket and would have incorporated those expenses in proposing a just and reasonable rate.

[34]Neither party challenged the TRA's authority to transfer the asset management issues into a docket separate from the rate case.

[35]The Manufacturer's Association was interested in having the matter transferred into a rate case in order to give the public notice and an opportunity to be heard on the issue, and because the Manufacturer's

(continued...)

-24-

case." In fact, the issue of whether the Gas Company could recover Asset Management Docket litigation expenses was presented and decided separately from the rate case issues in that docket.[36] Accordingly, we decline to adopt Appellees' argument, and we must conclude that the TRA's award of the Gas Company's litigation expenses was not made in a rate case or in the equivalent of a rate case.

### *Authority to Award Litigation Expenses in A Non-Rate Case*

The issue then becomes whether the TRA had the authority to permit the Gas Company to recover its litigation expenses in a proceeding that was not a "rate case." The Consumer Advocate argues that there is no authority, either express or implied, for the TRA to permit a utility to recover its litigation expenses in a case in which base rates are not being set. It argues that the award of litigation expenses in this case was "far different" from an award of normal operating expenses incurred in a rate case, and that no statutory or regulatory provision exists that permits the Gas Company to recover litigation expenses that it incurred in a non-rate case. The Consumer Advocate argues that the TRA's action in permitting the Gas Company to recover litigation expenses in a non-rate case was a dramatic change in regulatory practice, and that the TRA must clearly explain the basis of its authority to make such a change rather than merely relying on its general authority or citing the fact that the underlying litigation was "complex." The Consumer Advocate emphasizes that customers' bills are comprised of only two charges: the cost of delivering the gas, reflected in the base rate, and the cost of gas, determined by the application of the PGA Rules. Because the Gas Company's litigation expenses were not awarded either as an element of the base rate charged or through the application of the PGA Rules, the Consumer Advocate contends, the TRA was without authority to award the Gas Company the litigation expenses it incurred in the Asset Management Docket.

The Appellees approach the issue from a different perspective. They note that the TRA has been given plenary authority to govern and supervise utilities, and they argue that nothing in the statutes or the regulations *prohibits* the TRA from allowing a utility to recover litigation expenses incurred in a non-rate regulatory proceeding. The Appellees emphasize that this

---

[35](...continued)
Association argued that the TRA had no authority to award the Gas Company its litigation expenses unless it filed a rate case. Because the public was notified, and because the TRA duly considered the issue in a rate case, the Manufacturer's Association does not challenge the TRA's exercise of its discretion in awarding the Gas Company its just and reasonable litigation expenses incurred in the Asset Management Docket.

[36] As in Rate Case 1, the litigation expenses incurred in Rate Case 2 were incorporated into the just and reasonable rate that was fixed by the TRA, but the litigation expenses incurred in the Asset Management Docket were not included.

Court must not interfere with a decision by the TRA unless the TRA has clearly exceeded its authority, and that where there is "any doubt as to the existence or extent of a power conferred on the [TRA] . . . [such doubt] shall be resolved in favor of the existence of the power." Tenn. Code Ann. § 65-4-106. The TRA is clearly authorized to allow a utility to recover reasonable and prudent operating costs that are necessary to the utility's provision of gas to its customers, they argue, and this may include reasonable and prudent regulatory commission expenses, as that term is defined in the NARUC system of accounting. In addition, Appellees claim that, if a utility is not permitted to recover reasonable and prudent regulatory commission expenses incurred in an extraordinary and unusually complex proceeding, then the rates set by the TRA will end up being confiscatory, because the utility would have no way of recovering an extraordinary, legitimate cost of doing business. The Appellees point out that the Gas Company was left no choice but to expend a considerable amount of time and resources defending against the allegations of the Consumer Advocate in the Asset Management Docket, allegations which, as it turned out, were based on neither fact nor credible data.[37] Consequently, the TRA had the authority to allow it to recover the reasonable and prudent regulatory commission expenses in that case.

In support of its argument on appeal, the Consumer Advocate cites **Kingsport Power Company**, the case on which Mr. Buckner relied in support of his testimony. In **Kingsport Power**, a consumer association intervened in a proceeding before the Public Service Commission, the predecessor of the TRA.[38] After the matter was concluded, the consumer association filed a request with the Commission to recover the litigation costs it had incurred in the underlying proceeding, pursuant to the federal Public Utility Regulatory Practices Act of 1978 ("PURPA"), 16 U.S.C. § 2632. This statute permitted a consumer to seek reimbursement for attorney fees and other litigation costs from the utility if the consumer participated in a regulatory hearing and made a "substantial" contribution, in whole or in part, to the Commission's decision.[39] **Kingsport Power**, 1985 WL 1105936, at *1. The Public Service Commission denied the consumer association's request, stating: "The Commission has no statutory authority from the Tennessee legislature to award litigation costs to any party." **Id.** It found, however, that the consumer association would have been entitled to its litigation fees *if* the Commission had the jurisdiction to award them. The consumer

---

[37]The Gas Company notes that the Consumer Advocate withdrew the majority of the evidence supporting its claims ten days before the final hearing.

[38]The exact nature of the proceeding is unclear, because no record of the regulatory proceeding or evidence from the trial court was filed with the appeal. **Kingsport Power**, 1985 WL 1105936, at *1.

[39]The consumer was permitted to collect these fees by bringing a civil action against the utility in state court or by requesting an award of costs from the Commission. **Kingsport Power**, 1985 WL 1105936, at *1.

association filed an appeal to have the Public Service Commission's decision reviewed by the chancery court.

On appeal, the chancery court in **Kingsport Power** agreed with the Public Service Commission, holding that it had no authority to award litigation expenses to the consumer association. Because the Public Service Commission had no jurisdiction to award the relief sought, the chancery court held that the consumer association was not "aggrieved" by the Commission's decision and, therefore, had no standing to appeal. **Id.** at *2. The consumer association appealed to this Court. On appeal, this Court held that the chancery court did not have subject matter jurisdiction over the appeal from the Public Service Commission's order, because "there was no contested case for the court to review, and nothing before the court below to invoke its jurisdiction." **Id.** at *3. Accordingly, the appellate court held that it lacked subject matter jurisdiction over the appeal, and dismissed the appeal on that basis. **Id.**

In the case at bar, the Consumer Advocate relies on the pronouncement by the Public Service Commission recounted in **Kingsport Power**, with which the chancery court apparently agreed, to the effect that the Public Service Commission had no authority to award litigation costs to any party.[40] **Id.** at *1. After considering **Kingsport Power**, we must respectfully conclude that it is inapposite in this case. First, **Kingsport Power** involved a request for litigation expenses pursuant to a federal statute not at issue in the case at bar. More importantly, the substantive issue in **Kingsport Power** involved the consumer association's right to recover litigation expenses *from the utility*, not the utility's right to recover its operating costs from consumers through gas rates. Thus, the statement by the Public Service Commission on which the Consumer Advocate relies must be viewed in that context. For these reasons, we find that **Kingsport Power** does not support the Consumer Advocate's position in this appeal.[41]

Aside from its reliance on **Kingsport Power**, the Consumer Advocate insists that the TRA did not have the authority to permit the Gas Company to recover its asset management litigation expenses, because those expenses were not recovered either through the setting of

---

[40]The same Public Service Commission order stated: "No Tennessee statute confers on the Commission the authority to set attorney fees, expert witness fees, and other litigation costs *and assess these costs against the regulated utility*." **Kingsport Power**, 1985 WL 1105936, at *1 (emphasis added).

[41]Interestingly, in **Kingsport Power**, the Public Service Commission indicated in its order that, if the utility had voluntarily paid the consumer group its attorney fees, it would have treated that "expense as an operating cost of the utility." This comment seems to indicate that, had the utility been compelled to pay the litigation expenses of the consumer group under PURPA, the utility would have been able to recover that expense from its customers in the manner that the Gas Company seeks to recover its litigation costs in the instant case.

rates or through the PGA mechanism. The Consumer Advocate cites no authority that limits the TRA's authority to these two means of permitting a utility to recover its costs. Appellees, on the other hand, do not cite any specific statute or regulation authorizing the TRA to award asset management litigation expenses. Appellees rely instead on the broad general grant of power to the TRA.

Overall, from our review of the statutes granting authority to the TRA, the regulations, the caselaw, and the record in this case, we are persuaded that the Appellee's perspective on the issues raised on appeal is correct. The authority granted to the TRA in this arena is clearly intended to be plenary. The onus, then, is on the Consumer Advocate to show a limitation on that plenary authority given to the TRA, and it has not done so.

Caselaw and other TRA proceedings indicate that the TRA's authority is not limited as the Consumer Advocate insists. The power to "fix just and reasonable" rates is certainly one of the TRA's primary responsibilities in governing utilities. Indeed, the task of ratemaking has been delegated totally to the TRA, and the TRA invests much of its resources into the ratemaking process. *See CF Indus.*, 599 S.W.2d at 542. However, we agree with Appellees that the power granted by the legislature to the TRA in Section 65-5-101 is not limited to the setting of base rates. Rather, the statute directs the TRA to "fix just and reasonable individual rates, joint rates, tolls, fares, charges or schedules thereof, as well as commutation, mileage, and other special rates . . . ." Tenn. Code Ann. § 65-5-101. The statutory grant of authority suggests that, while the TRA's plenary power to supervise and regulate utilities *includes* the setting of base rates, its power is not *limited* to setting base rates. The statute indicates that the TRA has authority over all rates charged to customers, and that the TRA must be able to take any actions necessary in those proceedings to effectuate its decisions. *See BellSouth Adver. & Pub'g Corp.*, 79 S.W.3d at 506.

As explained above, the Gas Company's asset management practices directly affect the ultimate charges to the consumer, in that the Gas Company's profits from the sale of excess assets are passed on to the consumer, and they affect the reasonableness of the rates set out in the Gas Company's tariff through the charges or credits resulting from the IMCR.[42] This is why the underlying issues were raised in a rate case in the first instance – because asset management practices affect the ultimate rates charged to customers. The fact that the Asset Management Docket was *not* a rate case did not strip the TRA of its authority to allow the

---

[42]As we discuss in more detail in the analysis of the final issue on appeal, the asset management fund represents profits due to consumers from the Gas Company's asset management practices; it is not calculated by reference to the "cost of gas" calculations in the PGA Rules. Therefore, we do not agree with the Consumer Advocate's assertion that the TRA lacked authority to allow the Gas Company to recover its litigation expenses based on the absence of a PGA Rule permitting such recovery.

Gas Company to recover its litigation expenses incurred in that docket as a cost of doing business.

It is undisputed that the TRA had the authority to preside over the Asset Management Docket and to address the propriety of the Gas Company's asset management practices. The Gas Company had little choice but to participate in the Asset Management Docket to defend its asset management practices against allegations that they were not in the best interest of the consumer. At the conclusion of the proceedings, the TRA did not find any improper asset management practices by the Gas Company.[43] In fact, after nearly two years of proceedings, the Consumer Groups withdrew the testimony of the petitioners' main expert on the subject, shortly before the final hearing. The TRA considered the approximately $745,000 in litigation expenses incurred by the Gas Company in defending its asset management practices to be an unusual, extraordinary expense of the utility that was necessary, reasonable, and prudent.[44] If the TRA were not permitted to allow the Gas Company to recover these and other reasonable extraordinary operating costs, this would prevent the TRA from fulfilling its responsibility to ensure that the base rate charged by the utility covers the utility's operating expenses and provides a reasonable rate of return. Thus, in order to "fix just and reasonable" rates, the TRA must have the authority to permit a utility to recover reasonable and prudent extraordinary expenses.

The parties have not cited a case in which the TRA permitted a utility to recover its litigation expenses in a non-rate proceeding, and we have not found one. However, other TRA proceedings show that it is not unusual for the TRA to exercise its authority to permit a utility to recover one-time, extraordinary costs. For example, in TRA Docket No. 10-00107, In Re: Petition of Condo Villas of Gatlinburg Association, Inc. d/b/a Foothills Water Properties for Emergency Relief for Water Rates, Condo Villas requested emergency relief from the TRA. Condo Villas sought to recover for an unexpected, extraordinary loss of $15,810 caused by extreme weather conditions that caused a water line to break, and ultimately resulted in the loss of millions of gallons of water. Condo Villas sought permission from the TRA to assess a one-time fee of $155 to each of its 102 customers in order to recover this extraordinary expense. The Consumer Advocate intervened in the proceeding, and a hearing was conducted. The TRA granted Condo Villas the relief it requested. The TRA observed that, "for large utilities, changes in expenses are expected and are generally easy for the utility to absorb until a rate case filing." However, because Condo Villas was small and could not

---

[43]The TRA ordered a future review of the Gas Company's asset management practices, but we do not interpret this as a finding that any of its practices were improper.

[44]Again, the reasonableness of the litigation expenses is not an issue before this Court.

absorb the unexpected expenses at issue, the TRA permitted the one-time assessment it requested.

In TRA Docket No. 07-00007, Lynwood Utility Corporation filed a petition to increase its rates. In the course of those proceedings, consumers complained about odors arising from Lynwood's wastewater treatment facility. The Consumer Advocate intervened, and the parties reached a settlement of the rate case. The TRA approved the settlement, but it directed Lynwood Utility to file a petition to recover the costs associated with the resolution of the consumers' odor complaints. Accordingly, the utility filed Docket No. 08-00060, In Re: Petition of Lynwood Utility Corporation for Approval of a Cost Recovery Mechanism for Deferred Odor Elimination Costs, to recover those costs. Subsequently, the Consumer Advocate and the utility reached an agreement about the odor elimination costs recoverable by the utility. In this proceeding, there is no indication that the Consumer Advocate questioned the TRA's authority to defer odor elimination costs and recover those costs in another docket outside of a rate-setting case.

In Docket No. 07-00081, Petition of Atmos Energy Corporation for Approval of Tariff Establishing Environmental Cost Recovery Rider ("ECRR"), Atmos Energy sought permission from the TRA to recover over a period of three years $2.7 million expended to cleanup specific environmental sites through an ECRR. The Consumer Advocate intervened. The parties reached an agreement for Atmos Energy to recover $1.65 million over a period of four years, and the Consumer Advocate consented to the TRA's approval of an ECRR that provided for a recovery period of four years. Once again, there is no indication that the TRA's authority to permit the utility to recover extraordinary costs through the addition of a rider to the tariff was challenged in this proceeding.

Of course, none of these regulatory proceedings directly establishes the TRA's authority to allow the Gas Company to recover litigation expenses in a non-rate case.[45] They do, however, demonstrate the manner in which the TRA has addressed extraordinary costs in the past, and that the setting of base rates is not the only proceeding in which a utility has been allowed to recover costs.[46]

---

[45]The Consumer Advocate correctly points out that these cases involved a utility's request for a charge or assessment related to providing utility service, not to incurring litigation expenses in a regulatory proceeding.

[46]After granting the TRA broad authority over the governance of utilities, the General Assembly has not taken legislative action to curtail the exercise of that authority. Legislative silence on the subject can be interpreted as indicating legislative approval of the *status quo*. ***See Purkey v. Am. Home Assurance Co.***, 173 S.W.3d 703, 709 (Tenn. Ct. App. 2005) (stating that Legislature is presumed to be aware of state law and, by its silence, it intended to preserve the *status quo*).

We also find that the NARUC system of accounting gives credence to the Appellees' argument that regulatory commission expenses may be recovered by a utility if they are prudent and reasonable. The definition of "regulatory commission expense," which is considered an ordinary operating expense, does not differentiate between litigation expenses incurred in a "rate case" or those incurred in other types of regulatory cases. Rather, regulatory commission expenses explicitly include "expenses of counsel, solicitors, or attorneys . . . engaged in the . . . defense against petitions or complaints presented to regulatory bodies . . . ." This accounting principle does not, of course, authorize a utility to recover these operating expenses in every case; rather, it reflects an understanding in the regulated utility industry that these regulatory commission expenses are simply a cost of doing business. If the TRA deems it to be appropriate to permit the Gas Company to recover for this cost in a given proceeding, then it has the authority to allow such recovery.

The Consumer Advocate argues that, even if the TRA had the authority to award the Gas Company its Asset Management Docket litigation expenses, it did not properly exercise its authority because it did not explain the reason for its decision. It argues that a mere finding that the docket was "complex" or "protracted" is an insufficient basis on which to make such an award. We disagree. It is undisputed that the litigation expenses incurred in the Asset Management Docket proceedings were complex and that the Gas Company was compelled to participate. The amount of the Gas Company's litigation expense is not disputed on appeal. We find that the TRA's reasons in the record for awarding the Gas Company its litigation expenses in this case was sufficient, and its actions were not arbitrary or capricious.[47]

Given the TRA's plenary authority to regulate utilities, and the absence of a statute, regulation, or other authority prohibiting the TRA's actions, we hold that the TRA had the authority to permit the Gas Company to recover from its customers the reasonable and prudent litigation expenses incurred in the Asset Management Docket.[48]

### The American Rule

The Consumer Advocate argues that the TRA's award of litigation expenses in the Asset Management Docket violates the American Rule that each party should bear his own legal

---

[47]This is unlike the situation in *Tennessee American Water Co.*, wherein the final order of the TRA was "devoid of" reasons for denying half of the rate case expenses requested in that case. *See* 2011 WL 334678, at *27.

[48]The Consumer Advocate cites various policy reasons for its argument that the TRA *should not* have awarded litigation expenses. Such policy decisions are beyond the authority of this Court to consider.

costs absent a contrary contractual or statutory provision. ***See House v. Estate of Edmondson***, 245 S.W.3d 372, 377 (Tenn. 2008). The American Rule is not at issue in this case. As explained in our analysis of this Court's decision in ***Kingsport Power***, the TRA did not "award" fees to a "prevailing party," *i.e.*, it did not order the Consumer Groups to pay anything to the Gas Company.[49] Rather, it permitted the utility to recover from its customers the utility's reasonable and prudent litigation expenses. This argument is without merit.

### *Retroactive Ratemaking*

The Consumer Advocate argues that the TRA has the power to set base rates only on a going-forward basis; that is, rates may not be temporary or subject to a retroactive review that would require, in effect, either a refund by the company or an additional payment by consumers. ***See South Central Bell v. Tenn. Pub. Serv. Comm'n***, 675 S.W.2d 718 (Tenn. Ct. App. 1984). The Consumer Advocate claims that, because the TRA awarded litigation expenses based on the fact that the Asset Management Docket "stemmed" from Rate Case 1, and then allowed the Gas Company to recover litigation expenses from that proceeding after Rate Case 1 was closed, the TRA in essence allowed the utility to recover a "refund" from the proceeding. This decision, the Consumer Advocate argues, constituted impermissible retroactive ratemaking for which the TRA has no authority.

As noted above, the TRA's authority to allow the Gas Company to recover its Asset Management Docket litigation expenses was not based on the fact that it "stemmed" from a rate case. Rather, the TRA had the authority to permit the Gas Company to recover as an extraordinary operating expense the litigation expenses incurred in the Asset Management Docket. This argument is likewise without merit.

### **Authority to Allow Recovery From Asset Management Funds**

The Consumer Advocate argues that the TRA did not have authority to order that the Asset Management Docket litigation expenses incurred by the Gas Company be paid from asset management funds, because this method of recovery is accounted for in the PGA Rules, and the PGA Rules make no provision for the recovery of litigation costs as a part of the cost of gas. The Consumer Advocate argues that the PGA Rules specifically enumerate the items

---

[49]The Consumer Advocate further argues that the American Rule is effectively codified in the Uniform Administrative Procedures Act, which provides that "any party may be advised and represented *at the party's own expense* by counsel" in a contested case. Tenn. Code Ann. § 4-5-325 (emphasis added). Similarly, the TRA regulations include a provision stating that "[a]ny party to a contested case may be advised and represented, at the party's own expense, by a licensed attorney or attorneys." Tenn. Comp. Rules & Regs 1220-1-2-.04(1). For the same reasons, neither this statute nor this regulation applies to the TRA's decision to permit the Gas Company to recover litigation expenses from its customers.

that can be recovered as a part of the cost of gas. *See* PGA Rule 1220-4-7-.01 (definition of "gas costs"). It claims that the PGA Rules cannot be altered at the discretion of the TRA, but can only be changed through a "rulemaking" procedure. Because the Gas Company never sought to alter or amend the IMCR through a rulemaking procedure, the Consumer Advocate contends, the TRA in effect "changed a tariff to the detriment of consumers without notice or a hearing." For these reasons, the Consumer Advocate argues, the TRA exceeded its authority when it ordered that the Asset Management Docket litigation expenses be paid out of asset management funds.

We respectfully disagree. The asset management fund exists because of the Gas Company's asset management practices. It represents profits from the sale of gas and does not involve the cost of gas. We have already held that the TRA was authorized to allow the utility to recover the legal expenses it incurred in the Asset Management Docket. In its order, the TRA concluded that the most appropriate means of recovery for the Gas Company would be from the asset management fund:

> The panel determined that the most equitable method for the Company to recover these costs would be from asset management funds. Allowing recovery of legal expenses from asset management funds is an appropriate accounting treatment for the non-recurring legal expense and also provides the Company a more timely recovery of legal expenses it has already paid. The panel determined the recovery of legal expenses should come from the consumer's share of earnings from the asset management fund, rather than through a recurring charge on their monthly bill. Thereafter, the panel voted unanimously that recovery of legal expenses should be from asset management funds.

As explained above, the asset management practices are set forth in the IMCR, and consumers receive the benefit of their share of asset management funds through the provisions of the IMCR. Although the Consumer Advocate argues that the litigation expenses awarded must come "through the PGA mechanism," the reimbursement to the Gas Company of its litigation expenses will be made before the asset management funds are processed through the IMCR or the PGA mechanism. The IMCR provides that "gross profit margin *losses* shall be recovered from the firm commodity component of gas costs as determined under the presently effective Purchased Gas Adjustment Provision." (Emphasis added). The IMCR does not provide that the asset management funds are part of the PGA mechanism.[50]

---

[50]We are mindful of Mr. Hickerson's testimony that the refund would be accounted for under the Actual Cost
(continued...)

Moreover, in the TRA's order, a variety of Gas Company expenses were ordered to be recovered from asset management funds, including expenses for energy conservation and education. The Consumer Advocate does not contest the TRA's authority to order the recovery of these costs via asset management funds. In the absence of any express limitation on this exercise of the TRA's discretion in this way, we conclude that the TRA has the authority to order that allowable expenses such as the Asset Management Docket litigation expenses be paid from asset management funds, by virtue of its plenary power to set rates and govern and regulate utilities. Therefore, we conclude that the TRA did not exceed its authority in ordering that the extraordinary litigation expenses incurred in defending the Gas Company's asset management fund practices be recovered from asset management funds.

### CONCLUSION

The decision of the TRA is affirmed. Costs on appeal are to be taxed to Appellant Consumer Advocate and Protection Division of the Office of the Attorney General of Tennessee and its surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE

---

[50](...continued)
Adjustment component of the PGA. They would not be accounted for in this way, however, if they were first paid to the Gas Company as directed by the TRA.